Frank E. Scherkenbach (CA SBN 142549)
*scherkenbach@fr.com*
Andrew G. Pearson (*Pro Hac Vice*)
*pearson@fr.com*
Adam Kessel (*Pro Hac Vice*)
*kessel@fr.com*
Kevin Su (*Pro Hac Vice*)
*su@fr.com*
Kayleigh E. McGlynn (*Pro Hac Vice*)
*mcglynn@fr.com*
Daniel H. Wade (*Pro Hac Vice*)
*wade@fr.com*
FISH & RICHARDSON P.C.
One Marina Park Drive
Boston, MA 02210
Telephone: (617) 542-5070
Facsimile: (617) 542-8906

Olivia T. Nguyen (CA SBN 337927)
*onguyen@fr.com*
FISH & RICHARDSON P.C.
500 Arguello Street, Suite 400
Redwood City, CA 94063
Telephone: (650) 839-5070
Facsimile: (650) 839-5071

Counsel for Plaintiff
SPLUNK INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| SPLUNK INC.,<br><br>Plaintiff,<br><br>v.<br><br>CRIBL, INC., and CLINT SHARP, an individual,<br><br>Defendants. | Case No. 3:22-cv-07611-WHA<br><br>PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR LEAVE TO AMEND ITS COMPLAINT<br><br>DATE: May 25, 2023<br>TIME: 8:00 a.m.<br>JUDGE: Honorable William H. Alsup<br><br>JURY TRIAL DEMANDED |

1

## **TABLE OF CONTENTS**

2
**Page**

3   I.     INTRODUCTION ................................................................................................ 1

4   II.    BACKGROUND ................................................................................................. 2

5   III.   ISSUES TO BE DECIDED ................................................................................ 3

6   IV.    THE COURT SHOULD GRANT SPLUNK LEAVE TO AMEND ITS
           COMPLAINT .................................................................................................... 3
7
           A.    Applicable Law ...................................................................................... 3
8
           B.    Splunk's Amendment Is Not Futile ....................................................... 4
9
                 1.    The '443 Patent Is Directed to Eligible Subject Matter ........... 4
10
                       i.    Alice Step 1 ................................................................... 5
11
                       ii.   Alice Step 2 ................................................................... 7
12
                       iii.  The PAC alleges that Defendant Clint Sharp
13                           admitted the unconventionality of the claimed
                             technology ..................................................................... 9
14
                 2.    The '438 Patent Is Directed to Eligible Subject Matter ......... 11
15
                       i.    Alice Step 1 ................................................................. 12
16
                       ii.   Alice Step 2 ................................................................. 14
17
                 3.    The '206 Patent Is Directed to Eligible Subject Matter ......... 15
18
                       i.    Alice Step 1 ................................................................. 16
19
                       ii.   Alice Step 2 ................................................................. 18
20
                 4.    The '312 Patent Is Directed to Eligible Subject Matter ......... 18
21
                       i.    Alice Step 1 ................................................................. 19
22
                       ii.   Alice Step 2 ................................................................. 20
23
                 5.    The '467 Patent Is Directed to Eligible Subject Matter ......... 21
24
                       i.    Alice Step 1 ................................................................. 21
25
                       ii.   Alice Step 2 ................................................................. 22
26
                 6.    Defendants Had Pre-Suit Knowledge of the Patents and
27                     Knowledge of Infringement ................................................... 23
28

PLAINTIFF'S NOTICE OF MOTION AND MOTION
FOR LEAVE TO AMEND ITS COMPLAINT
Case No. 3:22-cv-07611-WHA

## <u>TABLE OF CONTENTS (continued)</u>

<u>Page</u>

C.    Splunk's Amendment Will Not Unduly Prejudice Defendants .......................... 24

D.    Splunk Is Not Seeking to Amend in Bad Faith or With a Dilatory
       Motive ........................................................................................................... 24

E.    Splunk Has Not Unduly Delayed ................................................................... 25

F.    No Other Reasons Support Prohibiting Splunk from Amending
       Its Complaint ................................................................................................. 25

V.    CONCLUSION ........................................................................................................ 25

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
5
    882 F.3d 1121 (Fed. Cir. 2018).................................................................. 5, 11, 25

6

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*,
    841 F.3d 1288 (Fed. Cir. 2016).................................................................. 16, 18
7

*Coop. Ent., Inc. v. Kollective Tech, Inc.*,
8
    50 F.4th 127 (Fed. Cir. 2022)................................................................... *passim*

9

*Eminence Cap., LLC v. Aspeon, Inc.*,
    316 F.3d 1048 (9th Cir. 2003)..................................................................... 3
10

11

*Enfish, LLC v. Microsoft Corp.*,
    822 F.3d 1327, 1335-36 (Fed. Cir. 2016) ................................................ *passim*
12

*Foman v. Davis*,
13
    371 U.S. 178 (1962) ...................................................................................... 3

14

*In re Fritz Cos. Sec. Litig.*,
15
    282 F. Supp. 2d 1105 (N.D. Cal. 2003) ...................................................... 24

16

*Google LLC v. Sonos, Inc.*,
    No. C 20-06754 WHA, 2022 WL 2870527 (N.D. Cal. July 21, 2022) ........... 15, 23
17

*Griggs v. Pace Am. Group, Inc.*,
18
    170 F.3d 877 (9th Cir. 1999)....................................................................... 25

19

*Jackson v. Bank of Haw.*,
20
    902 F.2d 1385 (9th Cir. 1990)..................................................................... 24

21

*Johnson v. Mammoth Recreations, Inc.*,
    975 F.2d 604 (9th Cir. 1992)......................................................................... 3
22

*Kaplan v. Rose*,
23
    49 F.3d 1363 (9th Cir. 1994)....................................................................... 24

24

*Packet Intel. LLC v. NetScout Sys., Inc.*,
    965 F.3d 1299 (Fed. Cir. 2020)................................................................. 5, 12, 21
25

26

*Sonos, Inc. v. Google LLC*,
    No. C 21-7559 WHA, 2022 WL 2046828 (N.D. Cal. June 7, 2022)...................... 4

27

28

**TABLE OF AUTHORITIES (continued)**

**Page**(s)

*Swarm Tech. LLC v. Amazon.com Inc.*,
    No. CV-21-00438-PHX-DWL, 2022 WL 3585835 (D. Ariz. Aug. 22, 2022) ...................... 12

*TecSec, Inc. v. Adobe Inc.*,
    978 F.3d 1278 (Fed. Cir. 2020)........................................................................ 19, 20

*Thunder Power New Energy Vehicle Dev. Co. v. Byton N. Am. Corp.*,
    340 F. Supp. 922 (N.D. Cal. 2018) ...................................................................... 4

*Voip-Pal.com, Inc. v. Apple Inc.*,
    375 F. Supp. 3d 1110, 1145 (N.D. Cal. 2019) (Koh, J.), *aff'd sub nom. Voip-
    Pal.com, Inc. v. Twitter, Inc.*, 798 F. App'x 644 (Fed. Cir. 2020) ......................... 18

*Yates v. W. Contra Costa Unified Sch. Dist.*,
    No. 16-CV-01077-MEJ, 2017 WL 57308 (N.D. Cal. Jan. 5, 2017) ...................... 25

**Statutes**

35 U.S.C. § 101 ................................................................................................ *passim*

**Other Authorities**

Fed. R. Civ. P. 15(a).......................................................................................... *passim*

Fed. R. Civ. P. 12(b)(6)..................................................................................... 1, 15

1    **PLEASE TAKE NOTICE** that on May 25, 2023 at 8:00 am, or as soon thereafter as counsel

2    may be heard, before the Honorable Judge William H. Alsup, in Courtroom 12 located at Phillip

3    Burton Federal Building & United States Courthouse, 450 Golden Gate Avenue, San Francisco, CA

4    94102, Plaintiff Splunk Inc. ("Plaintiff" or "Splunk") will and hereby does move the Court for leave

5    to amend its complaint pursuant to Fed. R. Civ. P. 15(a)(2).

6    Splunk has filed with this Motion as **Exhibit 1**, a redline version of the Proposed Amended

7    Complaint ("PAC") that shows all the proposed changes.[1]  The PAC supplies additional substantial

8    factual detail and evidence that preclude dismissal at the Rule 12(b)(6) stage of Splunk's (1) direct

9    patent infringement claims under § 101 and (2) willful and indirect patent infringement claims.

10   Splunk requests that the Court grant it leave to amend its Complaint.

11   **I.    INTRODUCTION**

12   Splunk moves to amend its complaint pursuant to Fed. R. Civ. P. 15(a)(2) and this Court's

13   March 17, 2022 Order (Dkt. 55, the "Order") to address the grounds for dismissal set forth therein.

14   The supplemental factual allegations and evidence cited in Splunk's Proposed Amended

15   Complaint address the perceived deficiencies in Splunk's patent-related claims raised in the Order,

16   as well as the arguments Defendants made in the briefing on their motion to dismiss.  In particular,

17   Splunk's allegations further explain *how* the claims capture improvements over conventional

18   technology and differ from conventional practices associated with that technology.  These additional

19   "how"-related allegations focus on the particular advances over conventional technology rooted in

20   the claims, not on implementation details that are tangential to the advances or were known to people

21   of ordinary skill in the art, which were a focus of Defendants' arguments.  While Splunk did not

22   believe the additional details contained in the PAC were essential at the pleading stage, it appreciates

23   the opportunity afforded by the Court to provide them now.

24   Splunk pioneered the field of machine data capture and analysis, and the PAC reflects that the

25   claims of each asserted patent mark important advances over conventional technology related to

26

27   [1] The PAC is supported by Exhibits A-P to Splunk's original complaint (Dkt. 1-01 to 1-16) and
     additional evidence attached hereto as Exhibits Q-T.  Splunk has omitted its previously filed exhibits

28   (A-P) for purposes of this motion only.  If the Court grants Splunk's Motion, Splunk will file an
     amended complaint with all aforementioned exhibits.

computer networking and search engine indexing for machine data.  These claims are not purely results-oriented, but instead capture specific techniques that meaningfully differ from prior practice. Indeed, as to the '443 and '438 Patents in particular, the PAC cites and discusses a recently-discovered document authored by Defendant Clint Sharp—CEO of the accused infringer—confirming that the technology claimed in the '443 Patent and improved in the '438 Patent was an "industry-first" that improved upon conventional technology, which, *inter alia*, was "hard to implement" and "d[id]n't work in cloud environments."  The PAC thus not only demonstrates that the claims are patent eligible, but that fact discovery will directly bear upon questions relevant to the § 101 inquiry, which should not be resolved against Splunk at the 12(b)(6) stage.

The PAC's non-conclusory factual allegations, taken as true, directly affect the Court's patent eligibility and pre-suit knowledge analysis, and at a minimum, raise fact issues that make dismissal inappropriate at the 12(b)(6) stage.  Because Splunk's proposed amendment addresses the Court's patent ineligibility findings explained in its Order, and because no factors under Rule 15(a)(2) warrant denial of leave—which should be "freely give[n] when justice so requires"—the Court should grant Splunk's Motion.

## II.   BACKGROUND

Before this case was filed in this Court, on October 5, 2022, Splunk sued Cribl and its CEO Clint Sharp in the District of Delaware asserting the same patent-based causes of action at issue here. *See Splunk Inc. v. Cribl, Inc. and Clint Sharp*, No. 1:22-cv-01313, Dkt. 1 (D. Del. October, 5, 2022) ("Delaware Complaint," Exhibit S to PAC); *see also* Dkt. 43 (Jt. Case Management Statement & Proposed Order) at 9.  In particular, all five patents asserted here were first asserted in the Delaware Complaint.  On October 21, 2022, Defendants stated that they intended to raise challenges related to both personal jurisdiction over Mr. Sharp and the propriety of venue in Delaware.  *See Splunk Inc. v. Cribl, Inc. and Clint Sharp*, No. 1:22-cv-01313, Dkt. 12 (D. Del. Nov. 23, 2022) ("Delaware Stipulation" Exhibit T to PAC).  To conserve judicial and party resources, the parties agreed that Splunk would dismiss the Delaware Complaint and refile its case against Defendants in this District, which Splunk did, on December 2, 2022 (Dkt. 1).

On December 23, 2022, Defendants asked this Court to dismiss Counts I-V (patent

1    infringement), parts of Count VI (copyright infringement), and Count IX (DMCA violation).  Dkt.

2    31.  In relevant part, Defendants argued that Splunk's asserted patents[2] claim subject matter that is

3    patent ineligible under 35 U.S.C. § 101.  The Court granted Defendants' motion in part, finding the

4    Splunk patents ineligible for reasons discussed in greater detail herein, and thus dismissed the patent

5    infringement claims.  Dkt. 55 ("Order") at 35.  The Court also dismissed Splunk's claims for willful

6    and indirect patent infringement on separate grounds, finding that Splunk's allegations were

7    insufficient to plead pre-suit knowledge.  *Id*. at 8.  In its order, the Court stated that Splunk may move

8    for leave to amend its complaint.  *Id*. at 30.

9    **III.    ISSUES TO BE DECIDED**

10   - Whether the proposed amended complaint contains plausible factual allegations from which

11     patent-eligibility under 35 U.S.C. § 101 is a reasonable inference, or that raise factual disputes

12     that prevent resolving the eligibility question at the 12(b)(6) stage.

13   - Whether the prior Delaware complaint establishes knowledge of the patents and knowledge

14     of infringement sufficient to state a claim for willful and indirect infringement.

15   **IV.    THE COURT SHOULD GRANT SPLUNK LEAVE TO AMEND ITS COMPLAINT**

16   **A.    Applicable Law**

17   Leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a).  The

18   Ninth Circuit has instructed that the policy favoring amendments "is to be applied with extreme

19   liberality." *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003).  "[L]eave to

20   amend should be granted unless amendment would cause prejudice to the opposing party, is sought

21   in bad faith, is futile, or creates undue delay." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604,

22   607 (9th Cir. 1992).  "In the absence of any apparent or declared reason – such as undue delay, bad

23   faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments

24   previously allowed, undue prejudice by the opposing party by virtue of allowance of the amendment,

25   futility of amendment, etc. – the leave sought should, as the rules require, be 'freely given.'" *Foman*

26   *v. Davis*, 371 U.S. 178, 182 (1962).  "The touchstone of the evaluation is prejudice to the opposing

27
28
---
[2] The five Splunk patents are U.S. Patent Nos. 9,208,206 ("the '206 patent"), 9,762,443 ("the '443 patent"), 9,838,467 ("the '467 patent"), 10,805,438 ("the '438 patent"), and 10,255,312 ("the '312 patent") (collectively, the "Asserted Patents" or "Patents-in-Suit").

party.  Absent prejudice or a strong showing for another factor, a presumption typically exists under Rule 15 in favor of granting leave to amend." *Sonos, Inc. v. Google LLC*, No. C 21-7559 WHA, 2022 WL 2046828, at \*1 (N.D. Cal. June 7, 2022); *see also Thunder Power New Energy Vehicle Dev. Co. v. Byton N. Am. Corp.*, 340 F. Supp. 922, 934 (N.D. Cal. 2018) (granting leave to amend § 101 allegations because "the Federal Circuit has made it clear that any doubt should be resolved in favor of permitting amendment").

## B.  Splunk's Amendment Is Not Futile

Although prejudice to the opposing party is the "touchstone" of the Rule 15(a)(2) analysis, Splunk begins with the "futility" prong, which brings into focus how Splunk's supplemental factual allegations and evidence address the patent-related issues raised in the Order.  As shown below and pleaded in the PAC, the asserted claims capture the technological improvements to which they are directed, and offer meaningful advances over conventional network and computer technology.

### 1.  The '443 Patent Is Directed to Eligible Subject Matter

As reflected in the PAC, the claims of the '443 Patent themselves describe a specific solution to distinct problems and flaws with conventional technology in the realm of computer networks.  In particular, the claims of the '443 Patent describe novel "remote capture agents" and a related architecture for remotely configuring and controlling them that differed from and improved upon conventional techniques for capturing and analyzing computer network data.  Indeed, the PAC attaches a presentation prepared by Defendant Clint Sharp—the founder and CEO of accused infringer and Defendant Cribl—that attests to the inventiveness of the claimed remote capture agents and related architecture, and the advances that they achieve over conventional technology.[3]

In its Order, the Court found that "neither the claim language nor the specification language" of the '443 and '438 patents "provide[] guidance on *how* the claims achieve their functional result." Order at 18; *see also id.* at 19-20 (finding "no alleged improvement is captured in the claim language.").  The PAC adds factual allegations and related evidence that address these perceived deficiencies.  As shown below, the amended "allegations [], taken as true, would directly affect the

---

[3] At the time Splunk filed its Complaint, it was unaware of the existence of this document.  That the factual record has changed since December illustrates how discovery can and will shed further light on the fact questions underlying the §101 inquiry.

district court's patent eligibility analysis," and therefore justify granting leave to amend. *See Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1126 (Fed. Cir. 2018) (reversing district court's denial of leave to file second amended complaint because proposed new allegations raised factual disputes underlying the § 101 analysis, and thus amendment would not be futile).

i.      *Alice Step 1*

The PAC includes supplemental allegations demonstrating that the '443 Patent claims describe "how" they achieve a technological advance over conventional technology and are thus non-abstract. PAC ¶¶ 100-106; *see also id.* ¶¶ 97-99 (description of conventional challenges), 107-112 (Clint Sharp statements related to claimed advances). In particular, the PAC's "how" allegations—which draw directly from claim language—relate to "the focus of the claimed advance over the prior art" and "how" that advance is achieved, rather than implementation details for other aspects of the claims that are not the focus of the invention. *See Packet Intel. LLC v. NetScout Sys., Inc.*, 965 F.3d 1299, 1309 (Fed. Cir. 2020) ("[A]t step one, we consider whether the 'focus of the claims is on [a] specific asserted improvement in computer capabilities ... or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool.'") (citing *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335–36 (Fed. Cir. 2016)). By contrast, Defendants' arguments were erroneously directed to "how" questions that do ***not*** go to "the focus of the claimed advance over the prior art." *See* Order at 18 (citing Reply Br. 4, criticizing disclosure related to, *e.g.*, "*how* the RCA monitors the network packets" and "obtains the configuration information remotely").

The critical difference between the invention claimed in the '443 Patent and conventional network capture and monitoring technology is what Clint Sharp himself deemed to be "industry-first agent-based network data capture technology"—*i.e.*, the claimed "remote capture agent" technology—which operated differently from conventional capture agents. *See* PAC ¶ 109-110, Ex. Q at 4-5. The advance of the remote capture agent approach is not in the mechanical implementation of "how" remote capture agents monitor packets or communicate over a network, but in the way they can be configured and reconfigured. PAC ¶¶ 100-103. Unlike conventional capture technology, the claimed remote capture agents are not "fixed" or "specific-purpose": their core functionality and related processing software (*e.g.*, for segmenting, timestamping, and transforming) can be easily

5

1    reconfigured via a configuration server. *Id.*  And since this reconfiguration can take place over a

2    network, and since remote capture agents can be implemented in software, geographic and scaling

3    roadblocks that posed problems in the prior art were overcome by the '443 Patent invention.

4    *Id.* ¶¶ 97-103, 107-12.  Thus, the PAC demonstrates that the advance of the '443 Patent claims is not

5    in re-implementing functionality performed by conventional capture agents (*e.g.*, "*how* the RCA

6    monitors the network packets," Order at 18 (citing Reply Br. 4))—it is instead in the claimed

7    technique that permits the claimed remote capture agents to be reconfigured dynamically and at scale.

8        At the core of this advance is the claimed "configuration information" that is obtained and

9    used by a "remote capture agent," and that is provided by a "configuration server," thus allowing for

10   remote configuration (and reconfiguration) over a network.  PAC ¶ 101 (citing '443 Pat. at cls. 1, 11,

11   19; 6:60-64 (explaining that conventional technology was generally not configurable in this manner:

12   conventional approaches "target specific end uses, they have been designed to operate in a fixed way

13   and generally cannot be dynamically or easily modified to address different and changing business

14   needs").  In particular, and in distinction from the conventional approach, the functions of the remote

15   capture agents—like "segmenting" "network packets" into "a plurality of events," or "transforming"

16   those events to generate useful data therefrom—are performed "based on... configuration

17   information," *see* PAC ¶¶ 103 (quoting cls. 1, 1, 19), not based on a "fixed" or "specific purpose"

18   configuration.  In other words, it is "configuration information" provided over a network that can be

19   changed at any time that defines the way the remote capture agents operate, not the initial design and

20   configuration, or tedious individualized setup, of the capture agent (as was conventional).

21   PAC ¶ 101.  For example, the configuration information provides criteria to the capture agents

22   regarding how to segment events based on "event boundaries" such as "character combinations and/or

23   line breaks," either discovered "automatically" by software, or via "event boundaries... configured

24   by the user."  *Id.* ¶¶ 101, 103 (citing '443 patent at 23:31-38, 8:35-48 (explaining advantages of

25   performing capture with "remote capture agents")).  Thus, the focus of the claims is not primarily in

26   the specific implementation by which remote capture agents actually "segment" data (*e.g.*, by using

27   regular expressions) or "monitor" network packets (*e.g.*, by capturing and storing them)—rather, the

28   advance of the claims fundamentally flows from performing these functions "based on" the remotely

1    provided claimed configuration information, which was not a technique used by the conventional

2    technologies at issue and enables greater configurability.

3        The same is true for the claimed "transforming" limitation.  The advance over the prior art is

4    specified by the '443 Patent claims: transforming is performed by remote capture agents themselves

5    "based on the configuration information" obtained from a "configuration server."  PAC ¶¶ 101, 104-

6    106.  Rather than transform data based on a fixed or specific-purpose configuration, data is

7    transformed based on configuration information provided (and potentially "update[d]," *see* '443

8    Patent at cl. 2) over a network.  *See id.*  This implementation supports what conventional technology

9    lacked: the capacity for "modification of the network capture technologies to address different and

10   changing business needs."  '443 Patent at 1:26-49; *see also* PAC ¶¶ 98-99.  Because transformation

11   is based on configuration information, remote capture agents may be configured and reconfigured to

12   transform data in the various ways described in the '443 Patent's dependent claims.  *See, e.g.*, '443

13   Patent at cls. 5, 6, 14, 15, 22, 23; *see also* PAC ¶ 104 (discussing further transformation details

14   explained in the specification).

15       This powerful paradigm—in which a "remote capture agent" performs functions like

16   "segmenting" and "transforming" *based on* "configuration information" from a "configuration

17   server"—was a marked advance over conventional technology, moving from a "fixed" and "specific

18   purpose" implementation to a more flexible and dynamic one.  *See, e.g.*, PAC ¶ 101 (citing '443 Pat.

19   at cls. 1, 11, 19; 6:60-64); Section IV.B.1.iii, *infra* (discussing admission by Defendant Clint Sharp

20   of the inflexibility of conventional network capture technologies, including that companies

21   traditionally had to "either add extra logging code to their applications, install hardware on their

22   networks or plugins in their application servers.").

23                              *ii.     Alice Step 2*

24       At *Alice* Step 2, the Order found that "no alleged improvement is captured in the claim

25   language," and "unlike the claims disclosing particular enhancements to computer technology the

26   Federal Circuit has found eligible at step two, the representative claims here merely apply result-

27   oriented, abstract ideas without specifying any non-conventional way to accomplish or practice

28   them."  Order at 19-20 (citing Reply Br. 8).  This finding is addressed by (1) the PAC's clarification

1    regarding the core configurability benefits of the '443 Patent invention and the correspondence of the

2    claim language to that benefit, *see* PAC ¶¶ 100-101, (2) the PAC's allegations regarding the

3    unconventionality of remote capture agents that are not "fixed" or "specific-purpose" and whose

4    operation can be configured via remotely provided configuration information, *id.*, and (3) various

5    other benefits described in the specification that flow directly from the claims, discussed in greater

6    detail below. *Id.* at ¶¶ 103-106, 107-112. Thus, the PAC credibly alleges that the '443 Patent claims

7    provide a number of useful advances over conventional network techniques, and thus contain an

8    inventive concept. *See Coop. Ent., Inc. v. Kollective Tech, Inc.*, 50 F.4th 127, 131 (Fed. Cir. 2022)

9    ("[U]seful improvements to computer networks are patentable regardless of whether the network is

10   comprised of standard computing equipment.").

11       For example, quoting claim 1, the PAC states that "the claimed 'remote capture agent' is

12   controlled by 'configuration information' provided by a 'configuration server,' thus allowing for

13   remote configuration (and reconfiguration) over a network." PAC ¶ 101 (citations omitted). Quoting

14   claim 7 of the '443 Patent, the PAC explains that "the configuration information can be generated by

15   an 'application' that 'access[es] the transformed event data,' therefore enabling the remote capture

16   agents to be '***dynamically configur[ed]*** . . . in real-time' based on the network traffic they are

17   monitoring, segmenting into events, and transforming." PAC ¶ 101 (emphasis added, citations

18   omitted). The PAC thus plausibly shows that the claims of the '443 Patent improve upon the

19   inflexible nature of conventional network capture devices, and therefore recite an inventive concept.

20   *Kollective*, 50 F.4th at 131.

21       Additionally, by "transform[ing] the network data ***directly at the remote capture agent***," as

22   recited in all of the independent claims, "the claimed transformation 'may offload processing tasks

23   from configuration servers … to remote capture agents … while avoiding overloading of client

24   network servers at remote networks.'" PAC ¶ 101 (citing '443 Patent at 8:21-27, emphasis added).

25   This approach to "transforming" constitutes a technical advance over routine and conventional

26   network capture technologies by "enabl[ing] a more efficient and flexible usage of network resources

27   than was previously possible." PAC ¶ 105; *Kollective*, 50 F.4th at 131. While "the conventional

28   approach often involved 'overload[ed] … client network servers' due to the processing demands of

transforming timestamped event data," "the claimed remote capture agent improves upon the routine and conventional arrangement and processing of events using conventional network capture technologies" by allowing for "transformation of network data at least at two distinct levels, including at the remote capture agents during generation of the events and at the configuration server and/or other components during subsequent processing of event data."  PAC ¶ 105 (citing '443 Patent at 14:21-2).  The claims explain "how" this advance is implemented: transformations can occur at remote capture agents (pursuant to "configuration information" that specifies the transformation to be performed), not just at a single "level" of the network being monitored.  PAC ¶¶ 104-106.

The PAC explains another benefit afforded by the claimed "transforming": by "transforming, based on the same configuration information, the timestamped event data into transformed event data" (claims 1, 11, 19), the remote capture agent can "convert [a] potentially large volume of raw network traffic into a smaller volume of events and further filter the event data as directed by the configuration information before transmitting the event data to other components…."  PAC ¶ 106 (citing '443 Patent at 8:30-34).  Per the PAC, the claimed approach to "transforming" thus provides a technological improvement over routine and technological capture processes by "reduc[ing] network traffic between remote capture agents[] and the other components of system[]."  *Id.* (citing '443 Patent at 8:27-29); *see also Kollective*, 50 F.4th at 131.  In other words, "'because capturing and pre-processing of the network data may be performed [directly] at the remote capture agents,' 'both network traffic between the remote capture agents and other network elements and subsequent processing of the network traffic by other network elements may be drastically reduced.'" PAC ¶ 106 (citing '443 Patent at 3:44-52).

### iii.   The PAC alleges that Defendant Clint Sharp admitted the unconventionality of the claimed technology

The PAC also includes allegations based on newly identified admissions of Defendant Clint Sharp regarding the unconventional nature of the claimed technology.  PAC ¶¶ 107-112.  Specifically, Mr. Sharp himself touted the "industry-first agent-based network data capture technology" that is at the core of the '443 Patent in a presentation that discussed various advantages provided by this technology over what was conventional.  *Id.* ¶ 107.  Mr. Sharp did so in the context of his work at

Splunk related to a company called Cloudmeter, which Splunk acquired in 2013. *Id.*[4]

As part of this work, Mr. Sharp authored an internal presentation about Cloudmeter Stream, a product that was integrated into Splunk's offerings and matured into "Stream App for Splunk." *Id.* ¶ 109 and Ex. Q (Cloudmeter presentation with speaker notes and metadata showing Clint Sharp as author). Mr. Sharp's Cloudmeter presentation relates to the remote capture agent approach of the '443 Patent, which Splunk further developed in connection with the '438 Patent. PAC ¶ 110, Ex. Q at 4-5. Mr. Sharp's description of this technology in his presentation confirms that it was neither routine nor conventional. PAC ¶ 112 (citing Ex. Q at 5). Indeed, his presentation also includes bullet points and speaker notes that identify many of the same challenges of conventional network capture technology discussed in the PAC and specification, and confirms that the claimed remote capture agent technology of the '443 Patent overcomes those challenges. PAC ¶¶ 110-112; *SRI*, 930 F.3d at 1303 (holding patent-eligible claims "necessarily rooted in computer technology in order to solve a specific problem in the realm of computer networks").

For example, referring to the inflexible nature of conventional solutions, the speaker notes state that "[t]he demand for actionable business information has never been greater, but for companies to get at this today they must either add extra logging code to their applications, install hardware on their networks or plugins in their application servers." PAC ¶ 111; *see also id.* Ex. Q at 4 ("Hardware solutions are hard to implement and don't work in cloud environments.").[5] The speaker notes then highlight the technological advances of the claimed remote capture technology. PAC ¶ 111. Unlike

---

[4] As background, Cloudmeter was founded by Michael Dickey, the sole inventor of the '443 Patent, and one of two inventors on the '438 Patent. PAC ¶ 108. It developed a software technology known as "Cloudmeter Stream," which directly relates to the "remote capture agents" and related configuration server architecture described and claimed in the '443 Patent. *Id.* Splunk worked to improve and integrate Cloudmeter's technology upon its acquisition of the company, and Mr. Sharp was involved in this process. *Id.* Although the parties have not yet offered their positions as to the level of ordinary skill in the art for the '443 and '438 Patents, Splunk expects that Mr. Sharp would be considered to have possessed this level of skill when he prepared the presentation discussed herein.

[5] The Order stated "RCAs 'can be physical hardware servers or virtual machines running in the cloud.'" Order at 17 (quoting '438 Patent at 4:65–67; 5:1–2). The specification and the PAC, however, make clear that remote capture agents "may capture network data originating from numerous distributed network servers, whether they are physical hardware servers or virtual machines running in [the] cloud." '443 Patent at 5:40-43; '438 Patent at 4:65-5:2; PAC ¶¶ 100-101, 110-111. In other words, RCAs can collect data from hardware servers or virtual servers. The claimed remote capture agents themselves, however, are implemented in software; they are not conventional hardware devices.

conventional "fixed-implementation" network capture technologies, the presentation notes explain that Splunk's claimed remote capture technology, "enables customers to pinpoint exactly what they want"—a direct result of the claimed arrangement whereby a remote capture agent segments and transforms based on "configuration information" from a "configuration server."  *See id.*; '443 Patent at cls. 1, 11, 19, 6:60-64 (explaining that conventional capture technology "generally cannot be dynamically or easily modified to address different and changing business needs"), 16:64-17:25 (explaining that transformation via "filter[ing]," *e.g.*, pursuant to cl. 5, can "remov[e] a subset of the event data and/or network data").  In a further reference to the claimed transformations and dynamic configurations captured by the claims, the presentation notes state that "[w]e process and apply business rules to the traffic while capturing it, enabling them to contextualize the data and immediately turn it into something meaningful."  PAC ¶ 111 (citing Ex. Q at 4); *see* '443 Patent at cl. 7 ("wherein the configuration server obtains the configuration information from an application used to access the transformed event data."), 10:46-58 ("The configuration information may then be used to dynamically configure or reconfigure remote capture agent 250 in real-time."), cl. 4 ("receiving an update to the configuration information from the configuration server" and generating timestamped event data based on the update).  And, in an additional reference to the claimed "transformations," the presentation notes explain that the remote capture technology "doesn't just 'capture everything,'" and thus instead reduces network traffic and corresponding processing requirements.  *See* PAC ¶ 111 (citing Ex. Q at 4).

Where, as here, a proposed amended complaint "presents specific allegations directed to 'improvements and problems solved by the . . . patented inventions," amendment is proper.  *Aatrix*, 882 F.3d at 1127.  At the very least, the determination of whether the claim elements or combinations are "well understood, routine, or conventional" is a question of fact, *id.* at 1128, and the Court, considering the current record and Splunk's expectation that additional evidence bearing on § 101 will be adduced in discovery, should not determine now that the '443 Patent claims fail this test.

### 2.   The '438 Patent Is Directed to Eligible Subject Matter

The claims of the '438 Patent build on the remote capture agent and configuration server model introduced in the '443 Patent, focusing specifically on generation of protocol-specific event

1   streams, further enhancing the configurability of the remote capture agents in a manner useful to

2   users.  As addressed by the supplemental factual allegations included in Splunk's PAC, the claims of

3   the '438 Patent provide specific guidance on *how* to achieve these technological improvements, such

4   that the claims are directed to eligible subject matter.  *See* PAC ¶¶ 115-124.

5                                          i.        *Alice Step 1*

6        The  PAC  demonstrates  that  the  '438  Patent  claims  focus  on  specific  technological

7   improvements in a non-abstract way.  PAC ¶¶ 117-124; *Swarm Tech. LLC v. Amazon.com Inc.*, No.

8   CV-21-00438-PHX-DWL, 2022 WL 3585835, at *8 (D. Ariz. Aug. 22, 2022) (finding that new

9   "factual allegations in the proposed FAC are sufficient to avoid dismissal under step one of the *Alice*

10  framework").  As with the '443 Patent, the PAC's "how" allegations are directed to "the focus of the

11  claimed advance over the prior art," as opposed to implementation details related to other aspects of

12  the claims.  *See Packet Intel.*, 965 F.3d at 1316.

13       As explained above, the focus of the claimed remote capture agents of the '443 Patent relates

14  to their configurability.  The '438 Patent takes this advance a step further, claiming a specific

15  approach to configuring these remote capture agents in a manner conducive to protocol-specific

16  network capture and monitoring.  PAC ¶¶ 115-124.  In particular, the claims of the '438 Patent teach

17  that remote capture agents can be configured with "configuration data" that is based on "an indication

18  of a protocol to be associated with the event stream, wherein the protocol is used by network traffic

19  monitored by the remote capture agent" and "a selection of an event attribute associated with the

20  protocol, the event attribute indicating data to be extracted from network packets of the network

21  traffic monitored by the remote capture agent."  *Id.* ¶¶ 117-118.  Remote capture agents that can be

22  configured in this protocol-specific manner lend themselves to easy and powerful administration, and

23  further  accomplish  what  Clint  Sharp  touted  as  both  desirable  and  novel  in  his  presentation:

24  "enabl[ing] customers to pinpoint exactly what they want" and not "just 'capture everything.'"  Ex.

25  Q at 4; *see* PAC ¶¶ 118-122.

26       In  particular,  the  claimed  approach  of  configuring  remote  capture  agents  based  on  "an

27  indication of a protocol to be associated with the event stream" and "a selection of an event attribute

28  associated with the protocol, the event attribute indicating data to be extracted from network packets

                                                12                 PLAINTIFF'S NOTICE OF MOTION AND MOTION
                                                                   FOR LEAVE TO AMEND ITS COMPLAINT
                                                                   Case No. 3:22-cv-07611-WHA

1   of the network traffic monitored by the remote capture agent" permits remote capture agents to be

2   configured in a particularly straightforward and useful manner that was not provided by conventional

3   technology.  PAC ¶¶ 118-122.  This can be seen in Figs. 4A-4B, for example, which show screenshots

4   of the user-facing software enabled by the invention.  Fig. 4A shows a graphical interface pursuant

5   to which remote capture agents can be configured by "an indication of a protocol to be associated

6   with the event stream"—*i.e.*, a selection of a particular protocol (*e.g.*, HTTP, DNS, SMTP, TCP, etc.).

7   Fig. 4B shows that the graphical interface could then allow a user to "select[]… an event attribute

8   associated with the protocol" for extraction:

9   

FIG. 4B

20

21   PAC ¶ 119.[6]

22          In this manner, the '438 Patent claims further improve on the configurability of the remote

23   capture agents of the '443 Patent, disclosing a mechanism by which they can be configured for

24   protocol-specific event streams: via "configuration data" that is based on a particular protocol and

25

---

[6] Fig. 4C shows additional useful functionality enabled by the '438 Patent's dependent claims related
to generating aggregated data from multiple network packets "over a defined aggregation interval"
and "generating an aggregated event" including the data.  *See* '438 Patent at cls. 4, 16, 25.  The
specification and PAC explain that the claimed aggregation technique reduces the "event data
generated while retaining the important aspects of the event data."  PAC ¶ 122 (citing '438 Patent at
21:32-36); *see also* '438 Patent at 11:50-58 (describing claimed embodiment in the specification).

PLAINTIFF'S NOTICE OF MOTION AND MOTION
FOR LEAVE TO AMEND ITS COMPLAINT
Case No. 3:22-cv-07611-WHA

1    "event attributes" associated with that protocol.  PAC ¶¶ 115-124.  The '443 Patent claims disclose

2    how to build capture agents with better configurability than what was conventional through network-

3    provided "configuration information" upon which the capture agents' segmenting, timestamping, and

4    transforming behavior is based.  The '438 Patent claims are directed to further configurability

5    improvements, tailoring the configuration information to useful protocol-specific network capture

6    and monitoring.  *Id.* ¶ 119.  This is a "useful improvement" in the computer networking realm.  Thus,

7    as alleged, the '438 Patent claims are patent eligible at *Alice* Step 1.  *SRI*, 930 F.3d at 1303.

8                                        *ii.        Alice Step 2*

9           The claims themselves capture inventive concepts by providing specific and non-functional

10   improvements over routine and conventional network capture and analysis technologies.  *Kollective*,

11   50 F.4th at 135 ("The record here contains concrete allegations in the complaint and the specification

12   that the segmentation limitation was not well-understood, routine, or conventional and 'recites a

13   specific technique for improving computer network' functioning.") (citing *SRI*, 930 F.3d at 1304).

14          For example, per the PAC and the '438 Patent specification, the '438 Patent claims improve

15   upon routine and conventional network capture technologies because they allow for "user-modifiable

16   configuration rather than [configuration] by 'hard coding' fixed events with pre-determined fields for

17   a given network capture mechanism," as was the case with conventional network capture technology.

18   PAC ¶ 118 (citing '438 Patent at 6:25-31).  By specifying the protocol, the claimed solution can create

19   custom "event streams from the network packets based on the protocols used in the network packets."

20   *Id.* (citing '438 Patent at 9:39-46).  And similarly, by specifying event attributes, the remote capture

21   agent may "extract the specified event attributes from the network packets in the packet flow … and

22   generate time-stamped event data from the extracted event attributes."  *Id.* (citing '438 Patent at

23   10:49-66).  The claimed solution thus creates a flexible approach that permits flexibility in specifying

24   event attributes (*e.g.*, a particular network address) and generation of time-stamped event data from

25   those particular event attributes (*e.g.*, data to or from that particular address).  PAC ¶ 119 (discussing

26   Fig. 4B of the '438 Patent, which "provides an example of a graphical user interface that makes use

27   of the claimed solution and illustrates the convenience and flexibility afforded by the invention.").

28          Additionally, claims 2, 14, and 23 recite that "sending the configuration data to the remote

                                                     14

capture agent causes the remote capture agent to configure generation of the event stream ***during runtime of the remote capture agent***." These claims are directed to a further technical advance because they enable the remote capture agent to "use … updated configuration information to generate one or more new event streams, discontinue the generation of one or more existing event streams, and/or modify the generation of one or more existing event stream," all dynamically while the remote capture agent is already processing events. *See* PAC ¶ 123 (citing '438 Patent at 6:61-7:21 (describing that remote capture agents may poll configuration servers at periodic intervals for updates to the configuration information), 20:50-21:12 (explaining how event streams are transmitted over the network as any updates to the configuration information are used to reconfigure the operation of the remote capture agent during generation of the event streams)). This contrasts with "conventional network capture technologies … [that] generally ***cannot be modified dynamically***…." *Id.* (citing '438 Patent at 6:20-24).

In view of the factual allegations set forth in the PAC, Splunk has plausibly alleged that the '438 Patent claims specific improvements to the functionality of the network capture devices, and the claims are therefore patent eligible, even if they may be implemented using standard computing equipment. *Kollective*, 50 F.4th at 130, 135 ("Determining whether the claimed network is well-understood, routine, or conventional is a question of fact that cannot be resolved at the Rule 12(b)(6) stage, and the district court erred in resolving this factual issue against [patentee].").

### 3.   The '206 Patent Is Directed to Eligible Subject Matter

The PAC makes clear that the '206 Patent claims are not directed to merely "previewing a data analysis rule on a test sample before applying the rule to a broader sample," Order at 14, and that the claims themselves, not the user, supply the advance over the conventional technology. Whereas much of Defendants' argument concerning the '206 Patent pertained to the role that humans play in the definition of parsing rules, Defendants overlooked the distinction between claims that merely computerize longstanding human activity (patent ineligible), and claims like those in the '206 Patent, which describe a software tool that facilitates the ability of a human to work in a new and better way than was conventionally possible (patent eligible). *See Google LLC v. Sonos, Inc.*, No. C 20-06754 WHA, 2022 WL 2870527, at *2, *8 (N.D. Cal. July 21, 2022) ("Google contends that the

claim is directed to an abstract idea because forming zone scenes necessarily relies on the 'subjective intent of the user at the time of grouping' . . . [But] the act of naming zone scenes is just one aspect of the claim.  Taken as a whole, the idea of the claim — to allow users to pre-save customized speaker groups and invoke them on demand for synchronized playback — is not directed toward a subjective mental process."); *see also Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1304-06 (Fed. Cir. 2016) (reversing dismissal and finding patent-eligible claims directed to networking tool that required human input).

### i.       Alice Step 1

The claims of the '206 Patent are directed to a software tool that improves upon the conventional manner in which search engine indexes were built.  "Conventional tools used to index search engine data tended to be command line tools with arcane command structures that required significant expertise to understand and to operate effectively.  Use of such tools, and therefore the ability to create a search engine index for machine data, was limited to individuals who had expertise in these tools."  PAC ¶ 127.  The conventional process by which a search engine index was built involved providing a parsing rule to a typically text-based software tool to create "index data" consisting of events defined by that parsing rule that was added to an "index store."  *Id.*, ¶ 128.  "If the parsing rule was ineffective (*e.g.*, it did not properly define event boundaries), the index store would be 'polluted' with index data that did not correspond to well-defined events."  *Id.*  "This 'pollution' would often first be recognized upon attempts to use the search engine index," at which point the index would need to be destroyed (or the bad data purged), and the indexing process would then need to be repeated.  *Id.*

The '206 Patent claims solve these problems in two ways.  First, unlike the conventional practice, the '206 Patent claims employ a technique in which "index data is generated ***before and separately from*** that data being stored in an index, thereby avoiding a polluted index."  PAC ¶ 129, 131; *see also*, *e.g.*, '206 Patent at cl. 19 (referring to a user's ability to indicat[e] a user preference not to use the first parsing rule in indexing raw data associated with the selected portion of raw data" after events created from that rule are "preview[ed]").[7]  "This permits the events to be inspected

---

[7] This point is also true of claim 1 and the other independent claims of the '206 Patent.

1   *without* first polluting the search engine index," which was the routine and conventional sequence of

2   events performed in conventional search engine indexing.  PAC ¶ 131.

3   Second, the claims of the '206 Patent specify a software tool that improves upon those

4   conventionally used in the search engine indexing process.  For example, the tool selects what is

5   essentially a "starter" parsing rule for the user by "analyzing" the data to be processed "to find a

6   match of a signature or pattern of a known data type, the match corresponding to a parsing rule in a

7   plurality of stored parsing rules."  PAC ¶ 130 (quoting '206 Patent, cls. 1, 21, 22 and related portions

8   of specification).  And further, the tool includes a graphical user interface that facilitates a user's

9   ability to define suitable parsing rules.  *Id.* ¶ 132.  The claims specify that the user interface displays

10  not only a preview of the searchable, time-stamped events, '206 Patent, cls. 1, 19, but also "an

11  indication of how at least some of the selected portion of raw data has been parsed," *id.*, cls. 5, 25,

12  "the parsing rule" itself, *id.*, cl. 2, and "parsing rules that have been determined to correspond to

13  known data types that match or closely match data in the selected portion of raw data, wherein the

14  determined parsing rules are caused to be displayed in a graphically distinct manner to indicate to a

15  user that the determined parsing rules may be relevant," *id.*, cl. 22.  This specifically claimed interface

16  "represents an important advance over conventional technology, which (1) did not preview the events

17  attributable to a parsing rule separately from and before an index was built consisting of those events,

18  and (2) relied on typically command line tools less user-friendly than the claimed graphical user

19  interface, and which erected barriers to search engine indexing by non-expert users."  PAC ¶ 132.

20  The Order correctly noted that claim 1 of the '206 Patent "does not specify *how* to select

21  parsing rules based on data analysis," Order at 13, but that is because the focus of the '206 Patent

22  claims is not providing a better process for a user to select parsing rules—instead, they focus on a

23  non-conventional software tool that itself facilitates better rule definition (and/or selection), including

24  by non-experts.  Splunk's point that "the claims describe software techniques that better define events

25  before indexing occurs, in conjunction with improved rule selection" referred to this software tool—

26  the "software techniques" here do not involve only the actions of users of that tool, but instead the

27  claimed GUI-based approach described above.  Order at 13 (citing Opp. at 11 and finding "the only

28  recited improvement is supplied by the user").  Software tools that do not merely computerize human

1    practice, but instead provide new and better ways for humans to use computers to accomplish tasks,

2    are patent eligible under *Alice* Step 1. *See, e.g.*, *Amdocs*, 841 F.3d at 1304-06. Defendants' arguments

3    ignore this critical distinction and incorrectly imply that software claims are ineligible if they pertain

4    to a tool used by humans, regardless of whether that tool computerizes a prior known human practice.

5                    *ii.*        *Alice Step 2*

6       At Step 2, the Order found that "the purported improvements [related to the '206 Patent] have

7    not been captured in the claim language." Order at 15 (quoting *Voip-Pal.com, Inc. v. Apple Inc.*, 375

8    F. Supp. 3d 1110, 1145 (N.D. Cal. 2019) (Koh, J.), *aff'd sub nom. Voip-Pal.com, Inc. v. Twitter, Inc.*,

9    798 F. App'x 644 (Fed. Cir. 2020)). The PAC addresses this perceived deficiency by clarifying the

10    improvements and their connection to the claims. The claims do not "merely recite[] abstract

11    information and mental steps processing this abstract information, which are purely functional," and

12    the benefits of the claims are not "better data filtering or improved mental processes." Order at 15

13    (quoting Motion at 9, 10). Rather, the claims are directed to a software tool that (1) generates index

14    data (*i.e.*, events to preview) without also adding it to an index store as was conventional, *see*

15    PAC ¶ 133, and (2) provides a GUI that facilitates the definition of parsing rules based on this preview

16    and the other information that the GUI provides. *Id.* ¶¶ 129, 134. Point (1) avoids a polluted search

17    engine index (because parsing rules can be "tested and observed without polluting the index stores,"

18    '206 Patent, 18:18-19), and point (2) offers an improvement over conventional tools for building

19    search engine indexes, which lacked the claims' various GUI features. *See* PAC ¶ 134. Thus, in

20    view of the PAC's supplemental allegations, the claims of the '206 Patent do, in fact, capture the

21    technological improvements at issue.

22          **4. The '312 Patent Is Directed to Eligible Subject Matter**

23       The PAC explains that the claims of the '312 Patent are directed not to computerization of a

24    mental process, but to a software solution for indexing arbitrary machine data—an important advance

25    over conventional technology in efforts to develop a search engine for raw time-series machine data.

26    *See* PAC, ¶¶ 151-152, 156, 163. The PAC further explains that, given the nature of the data at issue

27    and the tasks associated with indexing it, the claims are "different from, and not analogous to,

28    historical practices of organizing records that could be performed by humans. In particular, humans

1    were and are unable to meaningfully understand or generate search engine index data from domains

2    of data sources at issue in the '312 Patent, such as 'message bus traffic' and 'sensor data from real-

3    time monitors,' which can consist solely of extensive numerical or coded values, and can constitute

4    'streams of data in the form of events occurring perhaps hundreds or thousands of times per second.'"

5    *See id.*, ¶ 155.   Although the claims of the '312 Patent may make use of standard computer

6    components to perform the specific functions that they describe, these functions "provide what

7    conventional technology did not: a technique to index raw time-series machine data regardless of its

8    format or the presence of time information within that data."  PAC ¶ 158.

9                              i.       *Alice Step 1*

10           At *Alice* Step 1, the Order found that claim 1 of the '312 Patent "merely carr[ies] out a

11   longstanding commercial practice with the benefit of a computer" and "manipulates data but fails to

12   do so in a non-abstract way."   Order at 20 (also finding that Defendants' "assistant analogy is

13   appropriate").  The PAC makes clear, however, that the claimed approach to indexing raw time-series

14   machine data regardless of its format or the presence of time information within that data is neither a

15   longstanding commercial practice nor the computerization of work that could be performed by an

16   assistant.  PAC ¶¶ 156-163.  Just as humans cannot realistically serve as a computer's network

17   adapters that read and write network packets, *SRI*, 930 F.3d at 1304, compiling an index permitting

18   time-based searches across such data is and was beyond the ability of the human mind.  PAC ¶ 155.

19   Nor can the crux of the challenge described in the PAC and addressed by the claims—time-series

20   machine data, which is not amenable to indexing by conventional means, PAC ¶¶ 153-154, 163—be

21   abstracted away from the claims.  *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1293-94 (Fed. Cir. 2020)

22   (the *Alice* Step 1 analysis "depends on an accurate characterization of what the claims require").

23           The Order also found that the claims of the '312 Patent omit implementation detail regarding

24   how time stamps are calculated "when time information is unavailable."  Order at 21-22 (finding that

25   claim 1 "does not disclose how to 'calculat[e] a time stamp for [an] event using one or more stored

26   time stamps,' which are 'selected on a periodic basis in order to facilitate time stamp creation'")

27   (bracketing in original).  But the PAC makes clear that this deeper level of implementation detail is

28   provided in the specification, PAC ¶ 161, which is the backdrop against which the claims are read

1   and interpreted at *Alice* Step 1. *TecSec*, 978 F.3d at 1292-93 (*Alice* step 1 inquiry focuses on the

2   language of the claims "considered in light of the specification" (*quoting Enfish*, 822 F.3d at 1335)).

3                                      *ii.        Alice Step 2*

4          At Step 2, the Order found that "the representative claim and the alleged improvement

5   discussed in the complaint and specification are misaligned" because claim 1 "simply does not

6   capture how to 'improv[e] machine data analysis' given 'problems with the way conventional

7   computer search engines handled analysis and indexing of raw time series machine data.'" Order at

8   22 (bracketing in original). The PAC clarifies the connection between the claims and the

9   "improve[ed] machine data analysis" they provide over conventional technology.

10         As explained in the PAC, a conventional challenge to analysis of machine data was the lack

11  of a true time series search engine for that data, which "would require the ability to index arbitrary

12  sets of machine data, ranging from server logs to network packets to sensor data, such that time-based

13  searches could be run across the data." PAC, ¶ 154. "The data from these heterogeneous sources

14  needed to be homogenized to create a single index for all types of data, with time information treated

15  consistently (and inferred when necessary)," including "without advance knowledge of the domain

16  (or data format) of that raw data." *Id.* "Such a software system did not exist at the time of the '312

17  Patent invention." *Id.* This problem is addressed by the '312 Patent claims, which "set forth a

18  particular algorithm for processing raw time-series machine data to create searchable events suitable

19  to create an index for a time-based machine data search engine." *Id.*, ¶¶ 158-163.

20         The Order also found that the algorithm disclosed by the claims contemplated only "the use

21  of generic computer components in conventional ways" and therefore did not provide an inventive

22  concept. Order at 22. But the PAC explains that the claimed approach to creating searchable events

23  from raw machine data "marked a major advance in the efforts to create a search engine for time-

24  series machine data, because the '312 Patent claimed techniques by which the index that underpins

25  such a search engine could be created," which "[c]onventional technology" discussed in the

26  specification did not solve. PAC ¶ 163.[8]

27  _____

[8] The Order also found that the claim language and specification are "misaligned" and "mismatched"

28  because whereas the claims disclose "using a stored time stamp 'from one or more earlier processed

**5. The '467 Patent Is Directed to Eligible Subject Matter**

The PAC demonstrates that the '467 Patent claims recite a particular technique for doing what conventional dual-queue systems did not: dynamically instantiating dual-queue nodes in a multi-tenant dual-queue environment to save resources and offer better scaling as the number of tenants served by the system increases.  PAC ¶¶ 137-139, 141-148.  The claims explain "how" this advance over the prior art is achieved in detail, and are therefore non-abstract.  *Packet Intel.*, 965 F.3d at 1309; PAC ¶¶ 140-146.  Furthermore, because the claims override the routine and conventional sequence of events whereby each "tenant" received its own dual-queue system regardless of whether one was needed at a given time, the claims provide an inventive concept.  PAC ¶ 147.

       *i.*   *Alice Step 1*

The PAC demonstrates that the claims of the '467 Patent do not amount to mere automation of a conventional idea such as handling overflow traffic on demand, but instead are directed to a particular improvement over existing dual-queue systems.  *Id.* ¶¶ 137-148.  As alleged in the PAC, conventional dual-queue systems did not provide for dynamic instantiation of dual-queues; instead, each "tenant" received its own dual-queue system regardless of whether one was needed.  *Id.* ¶¶ 137-139.  This resulted in over-instantiation of dual-queues, wasting system resources and presenting scaling problems as the number of tenants being served increased.  *Id.*  The claims thus "improve the functioning of [] computer[s]" hosting dual-queue systems for multiple tenants by reciting a particular technique for dynamic instantiation in connection with receipt of live data and based on a determination that an assigned node is uninstantiated.  *Id.* ¶¶ 137-148; *Enfish*, 822 F.3d at 1335.

The Order held at *Alice* Step 1 that "[n]o particular technique for dynamically instantiating dual-queue nodes" is disclosed.  Order at 24.  The PAC includes supplemental allegations that identify where the claims particularly describe how to "dynamically instantiate [a] dual-queue node."  PAC ¶ 145.  For example, quoting claims 1, 29, and 30, the PAC explains that dynamic instantiation is

---

events' if time information is not available, the specification discusses an implementation in which 'further earlier *and/or later* events can be used for interpolation.'"  Order at 22.  The PAC makes clear that "[c]laim 1 ... covers one of various mechanisms disclosed in the specification as a potential way to accomplish 'time stamp interpolation' when time information for a given event is unknown."  PAC ¶ 161 (citing 9:31-47).  In other words, the specification discloses that "earlier and/or later events can be used for interpolation," and claim 1 specifies an implementation in which only "earlier" events are used.

1   performed "based on" the determination that "a dual-queue node assigned to the entity is

2   uninstantiated on the data server." *Id.* Then, based on that determination, the process of dynamic

3   instantiation "initializ[es]" two specific data structures: (1) "a live data queue" and (2) a "stale data

4   queue." *Id.* (quoting claims 1, 29, 30). The claims explain how to initialize these particular queues,

5   *i.e.*, by "allocating a portion of memory to serve as the live data queue of the dual-queue node" (claim

6   10), and by "identifying" and "assigning" "a partition of persistent data store associated with the

7   entity" "to serve as the stale data queue" (claim 11). *Id.* (quoting claims 10, 11). The claims further

8   detail how the two queues are implemented, *e.g.*, the live data queue is provided "to receive the live

9   data for processing," and the stale data queue is provided "to store a persistent backup of the live

10  data." *Id.* (quoting cls. 1, 29, 30); *see also* '467 Patent at 16:50-17:22 (further detailing how to

11  initialize live and stale data queues). The initialization process may also include initialization of a

12  "queue manager" (claim 15) that assists with processing live data received by the dual-queue node.

13  PAC ¶ 145. Thus, the focus of the claims—dynamic instantiation of dual-queue nodes in a multi-

14  tenant system—is explained in non-functional detail sufficient to satisfy *Alice* Step 1.

15       The Order also stated that claim 1 is "directed to handling overflow data on demand." Order

16  at 20. The PAC adds supplemental allegations to clarify that the claims are not directed to "handling

17  overflow traffic," but instead are directed to how to efficiently manage dual-queue data structures in

18  a computer system that are used to handle such traffic. PAC ¶ 148 (further alleging that "the dynamic

19  instantiation of dual-queue nodes was recognized by people of ordinary skill in the art to be different

20  from, and not analogous to, historical practices of handling overflow traffic on demand."). A person

21  of skill in the art would have recognized that the claimed features, including the requirements of a

22  multi-tenant system and of "dual-queue nodes," are all technical concepts—not human concepts. *Id.*

23  Indeed, the notion of "multi-tenant dual-queue systems" is purely computer-based. *Id.* Thus, in

24  addition to improving the functioning of computer systems that provide dual-queues to multiple

25  tenants, the claims of the '467 Patent have no human analogue and are non-abstract for this additional

26  reason. *SRI*, 930 F.3d at 1304; *Enfish*, 822 F.3d at 1337-38.

27                  ii.      *Alice Step 2*

28       At Step 2, the Order found that the claims do not disclose an inventive solution to the problem

1   of "avoiding lost data when incoming live data arrives too quickly," beyond "standard caching and

2   storing." Order at 24. The PAC includes supplemental allegations to clarify that the claims are not

3   directed to "standard caching and storing," but instead to techniques for managing and dynamically

4   instantiating dual-queue nodes in a multi-tenant dual-queue system (in connection with receipt of live

5   data and based on a determination that an assigned node is uninstantiated). PAC ¶¶ 140-148. In other

6   words, although the dual-queue concept does relate to "caching and storing," that is not the point of

7   the '467 Patent claims, which instead focus on problems associated with providing dual-queue

8   systems to many tenants.[9] The PAC explains that the routine and conventional sequence of events in

9   dual-queue systems was for each "tenant" to "receive its own dual-queue system, which was neither

10  scalable nor affordable from a computer resources perspective." PAC ¶ 139. The claims of the '467

11  Patent "override the routine and conventional sequence of events" by instantiating dual-queue nodes

12  of a multi-tenant dual-queue system in connection with receipt of live data and based on a

13  determination that an assigned node is uninstantiated—well beyond simply caching and storing data.

14  PAC ¶ 147; *SRI*, 930 F.3d at 1304 (citation omitted).

15          Lastly, the Order states that claim 1 "recites generic computer processes and machinery, and

16  a generic arrangement." Order at 24. The PAC's supplemental allegations overcome this finding by

17  distinguishing the claimed techniques for dynamic instantiation of dual-queue nodes from generic

18  dual-queue arrangements where each "tenant" received its own dual-queue systems. PAC ¶¶ 138-

19  141, 147; *see Enfish*, 822 F.3d at 1338.

### 6.  Defendants Had Pre-Suit Knowledge of the Patents and Knowledge of Infringement

22          Splunk's PAC contains further allegations pertaining to pre-suit knowledge of the patents and

23  knowledge of infringement for Splunk's willfulness and indirect patent infringement claims. This

24  Court's order in *Google v. Sonos* recognized that circumstances may exist where willful and indirect

25  patent infringement may be properly alleged without a notice letter, such as when the alleged infringer

---

[9] The PAC addresses the Order's finding that "[n]othing in [the claims] addresses increasing the amount of live data that is received or other analogous improvements that could supply an inventive concept" in a similar manner. Order at 24. The focus of the claims is not on "increasing the amount of live data that is received or other analogous improvements," but instead relates to a technique that improves the performance of a computer system providing dual-queues to multiple tenants. PAC ¶¶ 140-141; *Enfish*, 822 F.3d at 1337-38.

1  learned of the patents in a previous lawsuit.  591 F. Supp. 3d 638, 644 (N.D. Cal. Mar. 16, 2022).

2  The PAC alleges that Cribl learned of the asserted patents at least in the prior complaint filed by

3  Splunk against Cribl in Delaware, which involved the same patents and the same accused products.

4  PAC at ¶ 170.  The PAC also notes that Cribl had a meaningful opportunity—over 8 weeks—to

5  investigate Splunk's allegations of infringement.  *Id.*  The reasonable inference from these and other

6  allegations is that Defendants possessed the requisite knowledge and intent to infringe.

7        **C.**     **Splunk's Amendment Will Not Unduly Prejudice Defendants**

8        The determination of whether prejudice would occur often includes assessing whether

9  allowing an amendment would result in additional discovery, cost, and preparation to defendant

10  against new facts or new theories.  *See Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir. 1994) (prejudice

11  has been found where the "parties have engaged in voluminous and protracted discovery" prior to

12  amendment, or where "[e]xpense, delay, and wear and tear on individuals and companies" is shown);

13  *see also Jackson v. Bank of Haw.*, 902 F.2d 1385, 1387-88 (9th Cir. 1990) (prejudice exists where

14  permitting plaintiff to file an amended complaint will lead to "the nullification of prior discovery").

15  "The party opposing the amendment bears the burden of showing prejudice." *In re Fritz Cos. Sec.*

16  *Litig.*, 282 F. Supp. 2d 1105, 1109 (N.D. Cal. 2003) (citing *DCD Programs Ltd. v. Leighton*, 833

17  F.2d 183, 187 (9th Cir. 1987)).  Defendants will not be prejudiced by Splunk's amendment.

18        Here, Defendants are not prejudiced or caught off-guard by the facts and theories alleged in

19  the PAC.  Splunk's amendment does not change the nature of its claims, but only adds more

20  specificity regarding the underlying facts.  For example, Splunk's amendment does not assert any

21  new patents or causes of action.  It merely adds additional factual allegations supporting patent

22  eligibility, and explains that Defendants indisputably knew of the asserted patents and of their

23  infringement prior to this lawsuit (at least since service of the complaint in Delaware asserting the

24  same patents).  The proposed amendment also does not moot any discovery that has been sought and

25  this case remains in its earliest stages—indeed, Defendants have served no written discovery to date.

26  Thus, Defendants would not be prejudiced by amendment.

27        **D.**     **Splunk Is Not Seeking to Amend in Bad Faith or With a Dilatory Motive**

28        Splunk's amendment "consider[s] all criticisms made by alleged infringers," *see* Order at 30,

and is not in bad faith.  *See, e.g., Yates v. W. Contra Costa Unified Sch. Dist.*, No. 16-CV-01077-MEJ, 2017 WL 57308, at *2 (N.D. Cal. Jan. 5, 2017) ("Bad faith may be shown when a party seeks to amend late in the litigation process with claims which were, or should have been, apparent early."); *Griggs v. Pace Am. Group, Inc.*, 170 F.3d 877, 881 (9th Cir. 1999) (Bad faith  exists when the moving party seeks to amend merely "to prolong the litigation by adding new but baseless legal theories."). Splunk's amendment comes in the very early stages of litigation (discovery has just begun and—other than the Motion to Dismiss—no dispositive motions have been filed), and relates to claims of infringement Splunk has maintained at all times since the filing of the Delaware complaint.  Splunk's amendment is also not baseless because factual allegations in the PAC are sufficient to overcome the patent-eligibility and pre-suit knowledge criticisms raised by Defendants.  *See, e.g.*, *Realtime Data*, 831 Fed. Appx. at 498 n.3 (recognizing that factual allegations in amended complaint can suffice to overcome *Alice*); *Aatrix*, 882 F.3d at 1129-30 (recognizing that factual allegations in amended complaint can preclude a finding that elements were well-understood, routine, or conventional).

Nor is Splunk's amendment dilatory.  Rather, it is responsive to the Order.  *See* Order at 30. Given Splunk's position that its initial pleading did not reflect deficient patent claims, it could not address the criticisms of those claims called out in the Order until the Order issued.  Moreover, as to Splunk's allegations related to Ex. Q, Splunk could not have addressed that exhibit in its original complaint or briefing, because Ex. Q was first discovered as part of the PLR 3-2 document collection process, after Splunk's complaint was filed.  Splunk's PAC is offered promptly and in good faith.

### E.      Splunk Has Not Unduly Delayed

Splunk has acted promptly within the Court's fourteen-day period for moving to amend the complaint.  *See* Order at 30.  Thus, undue delay does not provide a reason to deny leave to amend.

### F.      No Other Reasons Support Prohibiting Splunk from Amending Its Complaint

There is no apparent reason for denying the motion to amend.  This is Splunk's first amendment and none of the facts that may militate against amendment are present here.  Consistent with the liberal standard applied to motions to amend, the Court should grant Splunk's motion.

## V.    CONCLUSION

For these reasons, Splunk respectfully requests that its motion for leave to amend be granted.

1   Dated:  March 31, 2023                         FISH & RICHARDSON P.C.

2

3                                                  By:  */s/ Frank E. Scherkenbach*
                                                        Frank E. Scherkenbach
4

5                                                  Counsel for Plaintiff
                                                   SPLUNK INC.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S NOTICE OF MOTION AND MOTION
                                                   FOR LEAVE TO AMEND ITS COMPLAINT
                                                   Case No. 3:22-cv-07611-WHA