1
2
3
4
5
6            UNITED STATES DISTRICT COURT
7
8            NORTHERN DISTRICT OF CALIFORNIA
9
10   SPLUNK INC.,
11              Plaintiff,                    No.  C 22-07611 WHA
12       v.
                                              **ORDER ON MOTIONS UNDER**
13   CRIBL, INC.,                             **RULE 50 AND RULE 59**
14              Defendant.
15
16                          **INTRODUCTION**

17       After a civil jury verdict, it seems commonplace nowadays for one side or the other (or

18   both) to contend that they are entitled to judgment, despite the verdict, as a matter of law and

19   say so based on arguments not brought up at the time it mattered at trial — in other words, they

20   want a redo with new arguments.  This trend is in the wrong direction.

21       In this action involving software interoperability, the jury found that a new entrant had

22   infringed an incumbent's copyrighted software and breached a general license (but not a

23   partnership license, which was terminated), and awarded the incumbent one dollar in nominal

24   damages.  A judgment and permanent injunction were entered to cabin the entrant's use of the

25   incumbent's software to licensed and fair uses under the copyright law, the latter being to

26   reverse engineer, test, and troubleshoot to support interoperability.  Both the incumbent

27   (copyright owner) and the entrant (copyist) now move for more favorable judgments as a

28   matter of law.  The former also moves for a new trial and altered injunction.

United States District Court
Northern District of California

**STATEMENT**

Incumbent copyright owner Splunk Inc. was founded in 2003 and runs Splunk Enterprise, a software service for businesses that stores and analyzes their data.  To get their data into Splunk Enterprise, Splunk offers special software called a Splunk Forwarder that businesses can install at their data sources — in cloud servers, factory-floor machines, or otherwise — to send data to software called a Splunk Indexer for ingesting into Splunk Enterprise.  Data is sent from forwarder to indexer using a special Splunk-to-Splunk (S2S) protocol.  Data also can be sent to indexers using other means, in particular using the HEC protocol, or HTTP Event Collector, although our jury specifically found such other means were insufficient for operating commercial integrations with Splunk Enterprise.  The fee for using Splunk Enterprise turns on the volume of data stored over time.

Entrant and copyist Cribl, Inc. was founded in 2017 by three former Splunk employees. It runs Cribl Stream, which also is a software service that started out complementing Splunk's set of software services but wound up competing with them.  Cribl Stream performs various operations on data as it streams from various data origins to various data destinations. Relevant here, Cribl Stream can strip away low-value data as it streams from a Splunk Forwarder to a Splunk Indexer.  This lets a business — which must be a customer of both Cribl Stream and Splunk Enterprise in this scenario — store only the data it wants at Splunk Enterprise and thereby either save money (store less data) or else get more value for its money (store more well-selected data) at Splunk Enterprise.

On August 6, 2018, Splunk granted Cribl a license to use Splunk Enterprise as a Technology Alliance Partner.  Such TAP Licenses let a partner use Splunk Enterprise as it develops software services that integrate with and extend Splunk Enterprise's features.  And, partners are allowed to use Splunk Enterprise to market these newly developed services and to market Splunk Enterprise.  At all times (including during the partnership), Splunk also licensed Cribl to use Splunk Enterprise under its Splunk General Terms.  This SGT License is the one available to the ordinary business user who downloads Splunk Enterprise and begins using it.

On November 2, 2021, however, Splunk terminated Cribl's TAP License. Splunk said Cribl had ceased being a complement and had become a competitor — and that it had violated its license and copyright law to do so. Splunk did not, however, revoke Cribl's SGT License also in effect at that date. So, after that date, Cribl had an SGT License but only an SGT License to use Splunk Enterprise. It kept developing and marketing interoperable software services, using Splunk Enterprise to do so.

On December 2, 2022, Splunk filed the instant suit. Its complaint asserted patent infringement (Counts I–V), copyright infringement of S2S (Count VI), copyright infringement of Splunk Enterprise and its source code (Counts VII–VIII), direct and indirect circumvention of copyright-protection measures (Counts IX–X), breach of the TAP License and of the SGT License (Counts XI–XII), and various state law claims (Counts XIII–XIV).

All patent claims were dismissed by motion (*see* Dkt. Nos. 55, 74, 103). The copyright claims respecting the S2S protocol and indirect circumvention were resolved by stipulation (Dkt. No. 115 ¶ 1). So too all claims stated against an individual defendant, the co-founder and chief executive officer of Cribl (*ibid.*). This left the copyright claims respecting Splunk Enterprise (and its source code), the contract claims respecting the TAP License and the SGT License, and the other state-law claims still in the case.

Importantly, the S2S protocol was merely a format for data and not software. The S2S protocol has never been copyrightable. But to learn how the S2S protocol was changed from iteration to iteration, Cribl had to run the Splunk Enterprise software to detect any changes. In this way, Cribl's product would be able to deliver its customers data in the exact S2S format expected by Splunk Enterprise.

We held a trial in two phases. In phase one, the jury decided underlying factual questions with relevance to all remaining issues. In phase two, the jury found some further facts in special interrogatories and applied the law instructed to all these underlying facts so as to enter findings on infringement and breach (*see, e.g.*, Dkt. No. 309 ("I Instruction") No. 11 (explaining)). In brief, the jury found copyright infringement and contract breach (not of the partnership license, but of the general license), and nominal damages. More specifically:

3

*As for the underlying facts*, the jury found that to make Cribl Stream "viably" interoperate with Splunk Enterprise required using the S2S protocol — simply using alternatives like the HEC protocol was not viable (Dkt. No. 321 ("I Verdict") Nos. 1–4).  And, using the S2S protocol required, the jury found, reverse-engineering the S2S protocol by using Splunk Enterprise (*id.* Nos. 1–2).  (Relatedly, the jury found that Cribl had not misappropriated source code (Dkt. No. 327 ("II Verdict") Nos. (1A), (B)).)  The public benefited, the jury found, from this copying and use of Splunk Enterprise, which was transformative and did not clearly increase or reduce revenues for Splunk (I Verdict Nos. 5–7).

*As for the copyright claims*, based on the phase one verdict, the district judge concluded that it was a fair use to copy Splunk Enterprise in order to reverse engineer the S2S protocol and a fair use to copy Splunk Enterprise in order to test and to troubleshoot for purposes of maintaining Cribl Stream's interoperability with Splunk Enterprise via the S2S protocol (Dkt. No. 317 ("II Instruction") No. 2; Dkt. No. 372 ("Fair Use Op.")).  Then, in phase two, the jury found that Cribl had willfully infringed Splunk's copyright in Splunk Enterprise (II Verdict Nos. 1B, 2).

*As for contract claims*, the jury found that Cribl had not breached the TAP License.  Nor had Splunk breached it when terminating Cribl as a rising competitor (*id.* Nos. 3–4, A, C (citing TAP § 6.3(b))).  But Cribl had breached the SGT License (*id.* No. 5).

*As for damages*, the jury found that Splunk had not proven damages and awarded only nominal damages of one dollar (No. 6).

A permanent injunction and judgment were entered after an extensive effort to mediate post-trial differences.  The injunction stopped Cribl from using Splunk Enterprise except for licensed and fair uses.  It defined the latter as those uses necessary to reverse engineer the S2S protocol, to test Cribl software for interoperability with Splunk Enterprise, and to troubleshoot Cribl software for interoperability with Splunk Enterprise.  *Notably, this meant the injunction banned Cribl from using Splunk Enterprise to market Cribl software.*  And, it required a compliance program involving Cribl logging its copying of Splunk Enterprise and Splunk challenging these logs and the purported uses (or otherwise) (Dkt. No. 392).

United States District Court
Northern District of California

Finally, both sides brought post-trial motions under Rule 50. *As for the copyright issues*, Splunk moved for judgment that Cribl's infringement of Splunk Enterprise was not a fair use. Meanwhile, Cribl cross-moved for judgment that it technically had not infringed Splunk Enterprise (it had not made fixed copies), or else that it had not done so willfully. *As for the contract issues*, Splunk moved for judgment that Cribl had breached the TAP License. And, it sought clarification and judgment as a matter of law that Cribl had breached the SGT License not only as to marketing uses but also as to reverse engineering, testing, and troubleshooting uses — either because the latter were not fair uses at all or because if fair uses the contract still proscribed copying for those uses. Meanwhile, Cribl moved for judgment that technically the restrictions of the SGT License were unenforceable as to instances of Splunk Enterprise downloaded from the Docker website (a platform where developers go to get and run applications). *Also*, Splunk moved under Rule 59 for a new trial as to contract breach of the TAP License, and as to damages. *Finally*, Splunk sought to amend the injunction.

This order follows full briefing and argument.

## ANALYSIS

Jury instructions are regularly prepared by judges and given to counsel for critique and for objection to be heard at a charging conference. Once the final charge is given, those instructions of law become the law of the case and the losing side may only complain on some point of objection or critique that was preserved.

In our particular trial, the draft instructions for phase one had a preface that read:

> Please submit any and all objections in writing by TOMORROW, APRIL 16, AT 7:00 A.M. A charging conference will take place after the defense rests (and any rebuttal or surrebuttal). *All objections not made at the charging conference will be waived.*
>
> Your objections must be based on the law and why the instructions as they stand are not in accordance with it. Mere argument without more will not suffice.

(Dkt. No. 301 at 1 (emphasis added)). Written objections were received from Splunk (Dkt. No. 305), and oral objections were made at our charging conference (Tr. 1628–62). Likewise, the draft instructions for phase two had a preface that read:

> Please submit any and all objections in writing by TOMORROW, APRIL 17, AT 7:30 A.M.  A charging conference will take place shortly thereafter.  *All objections not made at the charging conference will be waived.*
>
> Your objections must be based on the law and why the instructions as they stand are not in accordance with it.  Mere argument without more will not suffice.

(Dkt. No. 312 at 1 (emphasis added)) — that is, it had the same preface.  Written objections were received from Cribl (Dkt. No. 313) and Splunk (Dkt. No. 315), but the Court reemphasized that because of late-filed errata objections needed to be made orally at our charging conference (Tr. 1740).  We held that charging conference with limited interruption for other business (Tr. 1740–1764, 1769–84, 1788–99, 1809–18; *cf.* 1799–1809 (re fair use and instructions broadly)).

After an adverse verdict, counsel cannot make new objections or offer new theories of law that should have been raised at the charging conference.  This is to give the trial judge a chance to consider a change.  So, in this case, the law was settled in the jury instructions as given save and except for those critiques and objections expressly raised in a timely written response to the proposed instructions or else at the charging conference.

The motions now raised are full of points of law that were not raised in a timely written response to the proposed instructions or else at the charging conference.  As to these, the law must be taken as given in the jury instruction.  As to the points properly preserved, the district judge believes, as before, they are without merit.

### 1. THE RULE 50 MOTIONS.

A Rule 50 motion must be denied when, under the jury instructions as given, the trial evidence admits of a rational line of reasoning in favor of the verdict (even if it seems against the weight of the evidence).  A Rule 50 motion is not an occasion to complain about legal error in the instructions, for any such error could only be grounds for a new trial, not for judgment notwithstanding the verdict (except in the rarest of circumstances).  Nor is it an occasion to complain about evidentiary rulings or misconduct by counsel, which, at most, can only lead to a new trial, not a reversal of judgment.  When the Rule 50 movant had the burden of proof on

6

the issue — such as on contract breach — the movant might have lost on the simple ground that it had not carried its burden of proof. So, the movant must show that the evidence compelled *only* one verdict, taking into account the burden of proof standard.

### A.    THE COPYRIGHT ISSUES.

#### (i)    *Splunk's Motion Seeking a Ruling that There Was No Fair Use.*

Splunk does not challenge the division of labor between the jury and the judge in deciding this mixed question of fact and law. *See Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 23–24 (2021). Nor does Splunk challenge the threshold question of the uses at issue in this intermediate copying case — reverse-engineering, testing, troubleshooting, and marketing uses. *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 533, 541, 543 n.18, 546–48 (2023). Instead, Splunk asserts that as a matter of law the four statutory factors should have pointed against fair use at least for the testing and troubleshooting uses, if not also for the reverse-engineering use. Recall Splunk prevailed as to the marketing use, which was held not to be a fair use. This order takes these factors in turn, pointing out when the analysis applies to all three uses at issue in the motion and when it applies only to some. (It addresses the marketing use only occasionally to explain a difference from the other three uses.)

#### (a)    *The Purpose and Character of the Use.*

The first factor is "the purpose and character of the use." 17 U.S.C. § 107(1). The district judge determined this factor favored Cribl for reverse engineering, testing, and troubleshooting (Fair Use Op. 4–6).

*First*, as to all uses, Splunk argues that the record contains evidence that Cribl obtained Splunk Enterprise through false pretenses and broken promises (Splunk Br. 15–16). But the Supreme Court has held squarely that the character of the use turns on the copyist's "objective . . . use," not "subjective intent." *Warhol*, 598 U.S. at 544–45. And, here, among other relevant facts, the jury found that Cribl's objective use of Splunk Enterprise benefited the public (I Verdict 6). That is a general finding Splunk does not challenge as to any use. The

United States District Court
Northern District of California

United States District Court
Northern District of California

1     record supports the result reached, notwithstanding prior circuit law since overtaken by higher

2     authority.  *See also Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc).

3         *Second*, as to all uses, Splunk argues that the record is replete with evidence that all uses

4     had a commercial character — namely that "Cribl's entire focus [was] for Cribl Stream to use

5     the allegedly complementary aspects of [Cribl Stream] to ultimately replace Splunk

6     [Enterprise]" (Splunk Br. 14–15).  But this argument fails to focus on what exactly was

7     commercialized in each instance:  What "affects the weight [to] afford commercial nature as a

8     factor" is "the degree to which the new user exploits the copyright for commercial gain — as

9     opposed to incidental use as part of a commercial enterprise."  *Elvis Presley Enters., Inc. v.*

10    *Passport Video*, 349 F.3d 622, 627 (9th Cir. 2003).  Here, this distinction makes a difference:

11    *As for the reverse-engineering, testing, and troubleshooting uses*, the Court found that Cribl

12    *had incidentally used* the copyrighted work.  Cribl had sought to reverse-engineer Splunk

13    Enterprise's non-protectable, functional elements and then to test and troubleshoot its own

14    software's interoperability with those elements.  The copyright owner could not have rightly

15    expected to control those functional elements, whether or not other later software developed to

16    share those functional elements ultimately harmed the copyright owner.  And, to the extent

17    Cribl also copied the copyrightable, expressive elements of Splunk Enterprise to get at the non-

18    copyrightable, functional ones, this was reasonably necessary or even unavoidable (Fair Use

19    Op. 4–6).  By contrast, *as for the marketing uses*, the Court found that Cribl *had exploited* the

20    copyright for commercial use.  Cribl had demonstrated Splunk Enterprise to generate sales of

21    its complement Cribl Stream (in some instances generating sales of Splunk Enterprise, too).

22    This use was enjoined (Fair Use Op. 9; Injunction ¶ 1).  *See Warhol*, 598 U.S. at 538–40.

23        *Third*, Splunk contends that intermediate copying "to gain access to the functional

24    elements of that software and to discover the functional requirements for compatibility" is fair

25    use but only if the functional learnings are not later used for a competitive purpose (Splunk

26    Br. 13 (quoting Fair Use Op. 5)).  Again, not so.  At bottom, this argument repeats ones

27    rejected above.  The Copyright Act protects original creative works, not competitors seeking to

28

1    exclude rivals from facts, figures, and functionality.  *See Sega Enters. Ltd. v. Accolade, Inc.*,

2    977 F.2d 1510, 1522–24 (9th Cir. 1992).

3        Related to this point, Splunk argues that even if copying Splunk Enterprise for "reverse

4    engineering" was a fair use, copying it for "testing" and "troubleshooting" Cribl's *customers'*

5    *problems* were not fair uses because these were not limited to discovering Splunk Enterprise's

6    functional requirements *for interoperability* (Splunk Br. 14).  Yes, these uses are

7    distinguishable in some respects, but the evidence did not support that they were so

8    distinguishable as to make a difference on this factor.  *See Warhol*, 598 U.S. at 541, 543 n.18,

9    546–48.  Splunk made herkie-jerky changes to Splunk Enterprise such that software developed

10   to interoperate one day might not the next (*see* Cribl Opp. 13 n.11 (citing Dkt. No. 352-107

11   (TX-3616))).  Testing and troubleshooting were reasonably necessary to identify when reverse-

12   engineering had succeeded, and when more systematic efforts were needed again to achieve

13   interoperability.

14       Even assuming some testing and troubleshooting was not directed to reverse-engineering

15   as such, Splunk fails to explain how the evidence compels the conclusion that such testing and

16   troubleshooting was directed to exploiting anything the copyright owner rightly could have

17   expected to control:  Operating Splunk Enterprise "simply" to replicate the environment within

18   which Cribl's software operated (this being Splunk's characterization of the testing and

19   troubleshooting evidence that most favors Splunk (Splunk Br. 13)) is replication directed

20   towards using the functional elements of the one in conjunction with validating the functional

21   elements of the other under conditions where the functional elements operate together— that

22   is, to see how they interoperate functionally.

23       *Finally*, Splunk makes a litany of arguments that boil down to contending that the facts

24   here seem unlike the facts in cases where a transformative use was found, concluding that a

25   transformative use should not be found here (Splunk Br. 11–13).  Relying on *Google v. Oracle*

26   in particular, Splunk emphasizes that there code was copied to create code in a new

27   environment (newly into phones), while here code was copied to create code in the same

28   environment (sitting between Splunk forwarders and indexers).

United States District Court
Northern District of California

9

But Splunk's synopsis overlooks a difference in *Google*: There, the copyist copied and kept intact some of the software's source code, so where and why that code reappeared somewhere else was especially critical to the overall transformative use assessment; here, by contrast, the copyist *never copied* source code nor kept it, so where the fresh code appeared was less critical. 593 U.S. at 31, 33, 40.

Moreover, not every transformative use will look like the transformative use in *Google*. Indeed, even if Cribl Stream had promised nothing more than to modify the data flowing between Splunk Forwarders and Splunk Indexers, its use of copies of Splunk Enterprise to enable such capabilities perhaps could be transformative. *Cf. Lewis Galoob Toys, Inc. v. Nintendo of Am., Inc.*, 964 F.2d 965 (9th Cir. 1992) (holding end customers' use of a Game Genie sitting between Nintendo game cartridges and Nintendo game consoles to modify Nintendo's copyrighted displays made fair use of those displays). On our record, however, Cribl Stream did more than that minimum: It had the capability to expand from acting merely as middleware between Splunk Forwarders and Splunk Indexers to acting as middleware between many systems to facilitate the flow of data into Splunk Enterprise or into rival services — tending to make the use even more beneficial to the public on dimensions even further afield from anything within the scope of what a copyright holder could rightly expect to control by copyright. *Cf. Sony Comput. Ent., Inc. v. Connectix Corp.*, 203 F.3d 596, 606–07 (9th Cir. 2000) (Connectix's middleware enabling console-based game cartridges to be played on desktop computers).

This factor was found to favor fair use — except as to marketing — and Splunk fails to show this was error.

### (b)    *The Nature of the Copyrighted Work.*

The second factor is "the nature of the copyrighted work." 17 U.S.C. § 107(2). This factor "recognizes that creative works are 'closer to the core of intended copyright protection' than informational and functional works, 'with the consequence that fair use is [less] difficult to establish when the [latter] works are copied.'" *Dr. Seuss Enters., L.P. v. Penguin Books*

*USA, Inc.*, 109 F.3d 1394, 1402 (9th Cir. 1997) (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 586 (1994)).  This case plainly involves work of the latter kind.

*As to the reverse-engineering use*, Splunk argues that its code was more creative than credited.  But Splunk ignores two basic points.  *First*, Splunk does not address the actual code copied — whereas the nature of the work turns on the actual code copied (Fair Use Op. 7).  *Google*, 593 U.S. at 27–29.  Splunk touts the creativity of its source code.  But the evidence supported that it was the executable object code that was copied during reverse-engineering.  Also, no evidence compelled the conclusion that creativity in the source code — such as well-chosen variable names or well-crafted explanatory comments — ever propagated into the object code that was copied during reverse-engineering (Cribl Opp. 18).  *Second*, Splunk does not address the extent to which even the creative elements it touts (assuming they did carry into object code or were otherwise copied) were bound up with functional elements.  "[W]here [the] copyrightable material is bound up with [the] uncopyrightable material, copyright protection is 'thin.'" *Google*, 593 U.S. at 21.  As the fair use opinion stated, the copying here thus falls on the least suspect side (Fair Use Op. 7).

*As to the testing and troubleshooting uses*, Splunk argues that these uses involved copying other and additional code, which is partly true, and that this should make a difference in the nature of the work copied, which is not persuasive.  No evidence compelled the conclusion that anything but executable object code was loaded to run Splunk Enterprise.  No evidence compelled the conclusion that functional elements could have been copied separately from creative elements.

This factor was found to favor fair use for all uses — and Splunk fails to show error.

### (c)    The Amount and Substantiality of the Portion Used.

The third factor is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole."  17 U.S.C. § 107(3).  The crux of this factor is whether the amount was "reasonable in relation to the purpose of the copying."  *Campbell*, 510 U.S. at 586.  Thus, the amount of copying is considered first against the work itself, then more importantly

11

United States District Court
Northern District of California

against the proposed use. *See Warhol*, 598 U.S. at 543 & n.18. Here, this factor weighed in favor of Splunk but was accorded little weight (Fair Use Op. 7–8). Splunk argues the Court should have afforded it more weight (Splunk Br. 18–20). Splunk again overlooks basic points.

*First*, Splunk overlooks that it is unremarkable that the entire executable code was copied, particularly in relation to the proposed uses of reverse-engineering, testing, and troubleshooting Cribl's own interoperable software. Ordinarily, copying the entirety counsels against a finding of fair use. *Sony*, 203 F.3d at 606. But it does not preclude such a finding where copying the entirety is reasonable in relation to the use. *Sega*, 977 F.2d at 1526–27. As set out above, the functional elements of Splunk Enterprise were bound up with the creative elements. Substantial evidence showed it was reasonably necessary for Cribl to use the entirety of the Splunk Enterprise executable object code for these uses (Cribl Opp. at 18–19 (citing record); *see also* Dkt. No. 372 at 7)). No evidence compelled the conclusion that Splunk Enterprise was copied avoidably or for a dual purpose. *See Authors Guild v. Google, Inc.*, 804 F.3d 202, 222 (2d Cir. 2015). However, the same cannot be said for the marketing use. Fittingly, that use was not found to be a fair use.

*Second*, Splunk overlooks that it is irrelevant that the ultimate result of this copying was to threaten the entire codebase of Splunk Enterprise with fresh competition. At issue in this factor is the amount copied, not the amount threatened. And, the amount threatened also may be beside the point, as addressed in the next factor.

There is no manifest error in the finding that this factor favored Splunk but was accorded little weight (Fair Use Op. 7–8). With respect to the marketing use, this factor did favor Splunk. With respect to the other uses, this factor was treated as favoring Splunk, too, though an argument could be made this factor should have been neutral. Splunk suffered no error.

### (d)    The Effect of the Use Upon the Market for the Copyrighted Work.

The fourth factor addresses the "effect" of the entrant's copying on the "market for or value of the copyrighted work." 17 U.S.C. § 107(4). While the purpose-and-character factor conceptually examines whether the copyist's work in theory could be a substitute for the

12

copied work, the markets-effect factor examines whether the copyist's work in practice will be one. *See Warhol*, 598 U.S. at 536 n.12; *Campbell*, 510 U.S. at 590.

Recall our jury found that whether Cribl Stream increased or decreased Splunk Enterprise's profits overall was not proven (I Verdict 5; II Verdict A). These findings reflected the evidence. *Possibly increasing Splunk's total customers*, Cribl marketed both Cribl Stream and Splunk Enterprise to businesses that might not have heard about Splunk Enterprise otherwise. *But possibly decreasing Splunk's per-customer data stored*, Cribl Stream culled data from what each Splunk customer might have stored in Splunk Enterprise otherwise. *And, possibly maintaining or increasing Splunk's per-customer data stored*, Cribl Stream let customers forward more data from more data sources than before, such that after culling some data the amount stored in Splunk Enterprise might be the same or greater. Moreover, no evidence showed that Cribl Stream was usurping from Splunk Enterprise a copyright entitlement reserved to the copyright owner. So, following the jury, the district judge found this factor a toss-up (Fair Use Op. 8).

In its post-trial arguments, Splunk misses the factual complexity and the dispositive legal question.

*First*, Splunk simplifies the factual complexity: It argues, in brief, that each dollar a customer spent on Cribl to cull data was a dollar the customer would not spend with Splunk to store data. But, as above, the actual record was not so clear. Indeed, Splunk itself chose to partner with Cribl Stream in a program designed to find customers to buy from Cribl Stream and Splunk Enterprise at once. And, Splunk itself introduced a Cribl Stream-like service, Splunk Data Stream Processor (Splunk DSP), to coexist with Splunk Enterprise (not to supplant Splunk Enterprise).

*Second*, seemingly acknowledging that complexity and now arguing in the alternative, Splunk argues that even if Cribl Stream increased demand for Splunk Enterprise, this shows only that Cribl Stream affected demand for Splunk Enterprise — which it says is the dispositive point for finding that the fourth factor favors the copyright owner. Yes, the Copyright Act protects even a copyright owner's choice *not* to exploit the copyright. So, for

United States District Court
Northern District of California

example, if a copyist's movie version increases the value of the copyright owner's book version, even this increase in value supports the fourth fair use factor favoring the copyright owner. *Cf. Campbell*, 510 U.S. at 590 n.21. But Splunk's point raises another, which is devastating for Splunk. Not everything one competitor usurps from another is protected by copyright — and facts, figures, formats, and functionality are not protectable. The Copyright Act only protects a copyright owner against a usurpation of an entitlement that the Copyright Act protects. And here, if anything, the evidence better supports that Cribl Stream's competitive success as a "substitute" came from replicating functional elements that the Copyright Act does not cede to the copyright owner. *Cf. Google*, 593 U.S. at 34; *Campbell*, 510 U.S. at 592 ("[W]hen a lethal parody, like a scathing theater review, kills demand for the original, it does not produce a harm cognizable under the Copyright Act.").

Note that the marketing use did exploit copyright-protectable elements. And, such use reasonably had some effect on the market for the copyrighted work. Significantly, however, the marketing use was not held to be a fair use.

*            *            *

Splunk is not entitled to judgment as a matter of law that Cribl's reverse-engineering, testing, and troubleshooting uses were not fair uses, so its motion in this regard (Splunk Br. 9–22) is **DENIED**.

### *(ii)    Cribl's Motion Seeking a Ruling that There Was No Willful Infringement.*

Cribl was found at trial to have infringed Splunk Enterprise, and willfully. In other words, although some of Cribl's copying was for fair uses (addressed above), and although some of Cribl's copying was for licensed uses (addressed below), the jury still found this left some of Cribl's copying as *neither* for fair uses *nor* for licensed ones. Cribl does not complain about the judge's instructions to the jury. Instead, Cribl complains about the evidence presented to the jury. It argues the evidence failed to show that Cribl made any copies that could form the basis for an infringement claim. And, it argues the evidence failed to show that it knew or deliberately disregarded that any copies could infringe. Neither point is persuasive.

14

### (a)    No Unauthorized, Fixed Copy?

Cribl contends that no copy Cribl made of Splunk Enterprise could have formed the basis of an infringement claim.  *As for initial copies in disk*, Cribl argues that its downloaded copies of Splunk Enterprise were fixed copies but were authorized ones, with this authorization not depending on any further uses to which these copies or others from them were put.  *As for later copies in RAM*, Cribl argues that its copies loaded from disk into RAM were, if not authorized, too transitory to be "fixed" within the meaning of the Copyright Act.  *See MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 518–19 (9th Cir. 1993) (citing 17 U.S.C. § 101).  Because Cribl is plainly wrong about the RAM copies, there is no reason to reach anything about the disk copies.

There was direct evidence at trial that material portions of Splunk Enterprise's executable object code were loaded repeatedly into RAM.  And, there was circumstantial evidence at trial that these copies endured in RAM long enough to be perceived, reproduced, or otherwise communicated.  For example, an expert testified that copies in RAM endured until displaced by (some unspecified volume of) other processes, from which a jury could have inferred that at least on some occasions these copies endured long enough to be "fixed" copies.  Also, there was evidence that screen displays of Splunk Enterprise persisted long enough to be perceived while copies of Splunk Enterprise were being used, from which a jury could have inferred that the underlying copies in RAM persisted for a similar duration, too.  *Cf. Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121, 128 (2d Cir. 2008); *CDK Glob. LLC v. Brnovich*, 16 F.4th 1266, 1276–77 (9th Cir. 2021) (on preliminary injunction).  Yes, some kinds of copying might have involved more persistence than other kinds.  And, the copying involving the most persistence might have been done most commonly for uses that were fair uses or licensed uses — such as for reverse-engineering.  But the jury heard that copying associated with persistence "may" have been performed for uses that were not fair uses or licensed ones (Cribl Br. 6).  And, given that possibility, a jury could have inferred such especially persistent copying "was" at least sometimes performed for infringing uses like marketing.

1    Thus, there is substantial evidence for the jury's implied finding that embodiments of

2    more than transitory duration were made.

3                              *(b)        No Willful Infringement?*

4        Cribl next contends there was no evidence from which a jury could conclude Cribl

5    knowingly or recklessly infringed the Splunk Enterprise copyright. It focuses most on there

6    being no evidence that Cribl believed infringement was likely while taking deliberate steps to

7    avoid learning more. *See Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068, 1073 (9th

8    Cir. 2013).

9        Reciting Cribl's arguments nearly rebuts them. Cribl acknowledges that a jury could

10   conclude that Cribl's founders "contemplated whether there [wa]s a fair use right with respect

11   to Cribl's creation and maintenance of its interoperable software product" (Cribl Br. 8). And,

12   it acknowledges that a jury could conclude that there was an "absence of discussion" among

13   the founders as to whether "using Splunk Enterprise in marketing-related activities (*e.g.*, by

14   making it accessible in Cribl's customer sandboxes or demonstrating Cribl Stream in a manner

15   that might interoperate with Enterprise) was a potential [infringement] issue" (*id.* at 11).

16   Finally, Cribl argues that the reasonable jury *must* conclude from this comparison that the

17   "absence of discussion *demonstrat*[ed that] the founders did *not* contemplate" whether

18   marketing uses of its rival's software could be infringing (*ibid.*). However, a reasonable

19   jury — ours being one of them — could have observed all the same evidence and made the

20   opposite inference at the end: The founders were aware of copyright law, they were aware

21   their innovative uses came close to the line (for reverse engineering), *and* they were even

22   aware their less innovative uses all but certainly crossed the line (for marketing a rival

23   offering), *which is why* they specifically avoided talking or learning more about exactly where

24   that line was drawn before walking right over it.

25                      *              *              *

26       Cribl is not entitled to judgment as a matter of law that Cribl's copying was not in some

27   instances infringing — it never argues, for instance, that marketing uses were either fair uses or

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1    licensed ones under the SGT License — so its motion in this regard (Cribl Br. 4–11) is

2    DENIED.

3        **B.    THE CONTRACT ISSUES.**

4        Recall that Cribl was subject to the TAP License from August 6, 2018 to November 2,

5    2021 — and subject to the SGT License at all times.  Splunk contests how each contract as

6    well as the interaction between the two should have been interpreted and applied to the facts.

7        *(i)    Splunk's Motion Seeking a Ruling that Cribl
            Breached the TAP License (Effective from 2018 to
8            2021).*

9        The jury found the TAP License was not breached.  Splunk contends, however, that as a

10   matter of law the TAP License *did* bar reverse engineering; so, because the trial record

11   conclusively established that Cribl used Splunk Enterprise for reverse-engineering, a properly

12   instructed jury necessarily should have found that the TAP License *was* breached.  Splunk

13   seeks that judgment now as a matter of law.

14       *(a)    Restrictions of Section 4 Overtake
            Permissions of Sections 3.3?*
15

16       Splunk first argues that Section 4 bars reverse engineering irrespective of Section 3.3.

17   The Court instructed the jury that Section 3.3's permissions (including for uses related to

18   developing, testing, and marketing applications that extended the features or functionality of

19   Splunk software) overtook Section 4's restrictions (against reverse-engineering Splunk

20   software) because the latter section started out by saying its restrictions applied "[u]nless

21   otherwise expressly permitted by Splunk" (II Instruction No. 9).  In its motion, Splunk asserts

22   the opposite was true:  Section 4's restrictions overtook Section 3.3's permissions because of a

23   different prefatory phrase in Section 3 saying its permissions applied subject to compliance

24   with the restrictions in Section 4 (Splunk Br. 4–5).  This order sets out those contractual

25   provisions, before turning back to the arguments about them.

26       Section 4's provision imposing restrictions — including its opening limitation that the

27   jury instructions relied upon — is as follows:

28

17

> **4. License Restrictions and Obligations[:]**  *Unless otherwise expressly permitted by Splunk*, TAP will not, and neither TAP nor any User shall have a right to: **(a)** copy any Splunk Software (except as required to run the Splunk Software and for reasonable backup purposes); **(b)** modify, adapt, or create derivative works of the Splunk Software; **(c)** rent, lease, loan, resell, transfer, sublicense, distribute, disclose or otherwise provide Splunk Software to any third party; **(d)** decompile, disassemble or *reverse-engineer the Splunk Software*, or determine or attempt to determine any source code, algorithms, methods or techniques embodied in the Splunk Software, except to the extent expressly permitted by applicable law notwithstanding a contractual prohibition to the contrary; **(e)** provide to any third party the results of any benchmark tests or other evaluation of the Splunk Software without Splunk's prior written consent; . . . .

(TAP § 4 (header's capitalization altered) (emphasis added)).  Meanwhile, Section 3's provision granting permissions — including its opening limitation that Splunk seeks to rely on instead — is as follows:

> **3. License Grant and License Terms[:]**  *Subject to TAP's compliance with the Agreement (including the restrictions set forth in Section 4* (License Restrictions and Obligations) of these Terms and Conditions), the Splunk Software License Agreement (with respect to the Splunk Software) and the Program Guide: . . .

> **3.3    Splunk Software[:]**    Subject to Section 10.5 (Entire Agreement) part (iii), Splunk hereby grants TAP a non-exclusive, non-transferable, worldwide, non-sublicensable license during the Term to download (and make up to five (5) copies) and use the Splunk Software solely to:

> **(i)**  test the Splunk Software *for purposes of developing TAP Extensions* and to test TAP Extensions use with Splunk Software in a lab environment and to undertake other lab uses of the Splunk Software relating to the development and testing of TAP Extensions[, that is, 'including to support interoperability between the Splunk Software and TAP's system,' per Section 3.1].

Splunk's simplest point is that any reading of the contract whereby "reverse engineering" was "expressly permitted by Splunk" in Section 3.3 to trigger the exception in Section 4 was wrong because "reverse engineering" was not expressly stated by Splunk in Section 3.3.  (It was stated in the prohibitions of Section 4(d).)  But to be expressly permitted and to be expressly stated are not the same thing.  A contract that expressly states that "the worker can use any tool in the shed" expressly permits the worker to use the screwdriver in the shed.  Splunk's rereading of "unless otherwise expressly permitted by Splunk" as meaning "unless

otherwise expressly [stated] by Splunk" imposes an unduly cramped view of the express permissions that Splunk's partners relied upon.

Splunk's other point is that reverse engineering is not expressly permitted, either, because there were other ways to satisfy the permission to use Splunk Enterprise to "test the Splunk Software for purposes of developing TAP Extensions" and to "support interoperability between the Splunk Software and [the TAP Partner]'s system." By analogy, in other words, there were other tools in the shed besides the screwdriver (and screw) that could be used for connecting two things, namely a hammer (and nail). That is because the HEC protocol was available to partners, in Splunk's view obviating any need to reverse-engineer the S2S protocol. Splunk points to record evidence that it supported its TAP partner's use of the HEC protocol and never supported its TAP partner's use of the S2S protocol (Splunk Br. 5–6). But this runs headlong into jury findings that Splunk does not contest. The jury found "Cribl [could not] viably interoperate with Splunk forwarders and indexers without reverse engineering the S2S protocol" (I Verdict No. 1). In other words, a nail was not good enough (HEC), a screw was needed (S2S), and a screwdriver was essential to that installation (reverse engineering of S2S). Splunk may wish to emphasize other record evidence about what other partners did. But the jury's findings in phase one (read out in the morning) informed the Court's final instructions about the contract's permissions as articulated in phase two (finally published in the afternoon). There was no basis to state as a matter of law that Section 4's restrictions on reverse engineering were impervious to Section 3.3's permissions.

This forecloses even the need to reach whether Section 3's header imposed compliance with the restrictions of Section 4 because Section 4 itself already excepted from its restrictions anything expressly permitted anywhere else. This reading is not a piecemeal reading that ignores the whole contract. Indeed, the same interplay between Section 3 and Section 4 can be observed as to other express permissions and restrictions. For instance, Section 3.3 permits downloading five copies of Splunk Enterprise for purposes like testing, whereas Section 4 prohibits downloading any copy not necessary for running Splunk Enterprise, which is not five copies (Cribl Opp. 2). These provisions can be read together as consistent because Section 4

United States District Court
Northern District of California

includes the exception "unless otherwise expressly permitted." They cannot be read together if Section 4's most restrictive language is read to dominate Section 3's most permissive language notwithstanding Section 4's own exception.

Moreover, Splunk abandoned the contention raised here that the prefatory remark in Section 3 subjected even Section 3.3 to the limitations in Section 4(d) regardless of the prefatory remark in Section 4 (*see* Cribl Opp. 2–3). Yes, it is true that Splunk did move for judgment as a matter of law that the TAP Agreement barred reverse engineering (Dkt No. 304 at 11). But the most specific that motion got about language in the TAP License was to cite a footnote to Splunk's prior filing calling forth certain terms in the contract for the Court to interpret (*id.* at 11 n.2 (citing Dkt. No. 269)) — and those terms did not include the new one raised here. (Indeed, Splunk's position cited therein led with this: "[A]ll other terms in the SGT and TAP agreements, other than as expressly noted below, should be submitted to the jury" (Dkt. No. 269 at 1).) Similarly, it is true that Splunk did object to phase-two jury instructions involving the TAP License (Dkt. No. 315 at 2–5). But it never objected on the basis of the specific language cited here. To suppose that a sweeping objection — such as an objection to any interpretation that would permit reverse engineering — could suffice to preserve all subsidiary ones would lead to absurd results. If that were the rule, a party to a jury trial could state its preferred results, not contribute to the work of contract interpretation at trial (which involves mixed questions of fact and law), and then seek judgment as a matter of law (or a new trial) if the results did not match preferences. This is no efficient way to administer justice, and nothing contrary is required by any binding decision cited by the non-binding decisions cited by Splunk (Splunk Reply 3 n.1).

### (b) TAP License Overtakes SGT License Under Section 10.5(iii)?

Splunk next argues that the TAP License bars reverse engineering irrespective of the SGT License. Important to note here is that the two contracts addressed rights afforded by statutory law differently. The Court instructed the jury that the TAP License included an extra clause recognizing that the contract could relinquish fair use rights otherwise available (*see*

TAP § 4(d)), whereas the SGT License preserved the full extent to which the statutory

privilege of fair use protected reverse engineering (*see* SGT § 9(a)) (II Instruction Nos. 9,14).

Moreover, the Court instructed the jury that both contracts applied at all times and "[i]f you

find that some or all of Cribl's reverse engineering was allowed by the SGT contract but not

allowed by the TAP contract, the ambiguity must be resolved in Cribl's favor (so as to allow

such reverse engineering) because the ambiguity should be resolved against the drafter" (II

Instruction No. 14; *see also* Tr. 1759–60).  For the first time, Splunk argues that the

TAP License overtook the SGT License.  This is based on a reading of Section 10.5(iii) of the

TAP License (Splunk Br. 6).  That section reads as follows:

> **10.  General.**
>
>  . . .
>
> > **10.5    Entire Agreement[:]** The ['Technology Alliance Partner Program Agreement'] consists of the Program Guide, these Terms and Conditions and any documents, exhibits, addenda or further terms and conditions referenced therein, and comprises the entire agreement between Splunk and [the 'Technology Alliance Partner'] and supersedes all prior or contemporaneous negotiations, discussions or agreements, whether written or oral, between Splunk and TAP regarding the licenses granted herein, provided that:
> >
> > >  . . .
> >
> > > **(iii)**   to the extent there is conflict between the ['Technology Alliance Partner Program Agreement'] and the applicable *Splunk End User Software Agreement*, the ['Technology Alliance Partner Program Agreement'] shall govern; and . . . .

Note that Section 1 of the TAP defined "'*Splunk Software License Agreement*' [as] the then-

current form of standard end user license agreement that governs the use of Splunk Software

that any party looking to access and use Splunk Software must accept as part of the

downloading process" — that is, the Splunk General Terms License.

The answer here is succinct:  Splunk failed to preserve this argument.  It never argued

even in sweeping terms that the TAP License overtook the SGT License in the case of conflict.

It never cited to Section 10.5(iii).  As counsel for Splunk conceded at our oral argument on this

motion (at 6):

United States District Court
Northern District of California

United States District Court
Northern District of California

**MR. CASEY JAMES McCRACKEN [of Gibson Dunn & Crutcher, LLP, appearing for Splunk]:** . . . And finally on that issue, the TAP Agreement actually says which agreement controls in the event of a conflict between --

**THE COURT:** Was that provision ever pointed out to me?

**MR. McCRACKEN:** It was --

**THE COURT:** No.  It was not.

**MR. McCRACKEN:** It was not in the objections to the Jury Instructions.

**THE COURT:** It was not.

**MR. McCRACKEN:** I agree with that.

Indeed, it was the district court — not Splunk — that even raised the possibility that the SGT License might operate at the same time as the TAP License (Tr. 1758–59, 1762).  The district court proposed that any conflict should be construed against the drafter (*ibid.*; *compare also* Dkt. No. 312 at No. 13, *with* II Instruction No. 14 (adding)).  Splunk neither proposed that both contracts applied, nor that the TAP License dominated the two.  Even more basic than Splunk having had the best opportunity to avoid ambiguity in what it had drafted, it had the best opportunity to know what it had drafted.  Splunk fired its counsel and brought in a new firm but that is not an occasion for new rulings on never-made objections or redo of a jury trial in federal court.  Even if the jury had been told the TAP License's provisions overtook the SGT License's provisions, the jury still could have concluded from our record that the TAP License permitted reverse engineering for the reasons addressed above.

\*          \*          \*

Splunk is not entitled to judgment as a matter of law that the TAP License barred reverse engineering, nor that the TAP License's stingy approach to fair use stamped out the SGT License's more permissive approach to fair use, so its motion in this regard (Splunk Br. 3–6) is **DENIED**.

1

2

> ***(ii)    Splunk's Motion Seeking a Ruling that Cribl
> Breached the SGT License in Still More Ways.***

3      Splunk argues that it is entitled to judgment as a matter of law that the SGT License was

4   breached not only by Cribl's marketing uses of Splunk Enterprise but also by its reverse-

5   engineering, testing, and troubleshooting uses.  The jury found that the SGT License was

6   breached (II Verdict No. 5).  But, it did not specifically find what provisions of the

7   SGT License were breached.  *Nor did Splunk at the time ask that the verdict form be more*

8   *specific to avoid this ambiguity.*  Instead pointing out this ambiguity after post-trial briefing,

9   the district court found that the evidence at trial and *the jury's other findings* were most

10   consistent with the jury having found that marketing uses violated the SGT License and were

11   not fair uses, but that troubleshooting, testing, and reverse-engineering were fair uses not

12   violating the SGT License (Order re Remaining Claims 7).  Its arguments focus on Section

13   9(a), Section 9(c), and Section 9(e).  All together and in context, they read as follows:

14   > **9. Use Restrictions[:]**  *Except as expressly permitted in an
15   > Order, these General Terms or our Documentation*, you agree not
16   > to (nor allow any user or Third  Party Provider to): **(a)** reverse
17   > engineer (*except to the extent specifically permitted by statutory
18   > law*), decompile, disassemble or otherwise attempt to discover
19   > source code or underlying structures, ideas or algorithms of any
20   > Offering; **(b)** modify, translate or create derivative  works based on
21   > the Offerings; **(c)** use an Offering for service bureau purposes, or
22   > for any purpose other than your own Internal Business Purposes;
23   > **(d)** resell, transfer or distribute any Offering; **(e)** access or use any
24   > Offering in order to monitor its availability, performance, or
   > functionality for competitive purposes; **(f)** attempt to disable or
   > circumvent any license key or other technological mechanisms or
   > measures  intended to prevent, limit or control use or copying of,
   > or access to, Offerings; **(g)** separately use any of the applicable
   > features and  functionalities of the Offerings with external
   > applications or code not furnished by Splunk or any data not
   > processed by the Offering; **(h)** exceed the Capacity purchased or **(i)**
   > use any Offering in violation of all applicable laws and regulations
   > (including but not limited to any  applicable privacy and
   > intellectual property laws).

25   (SGT § 9 (all but first emphasis added)).

26

27

28

### (a)    Fair Use Not "Specifically Permitted by Statutory Law" Under Section 9(a)?

Splunk first argues that Section 9(a) did not contemplate any exception for fair uses, and that even if it had contemplated such exception it only would have applied to fair uses for reverse engineering (Splunk Br. 7–8).  Under Section 9(a), the user agrees not to "**(a)** reverse engineer (*except to the extent specifically permitted by statutory law*), decompile, disassemble or otherwise attempt to discover source code or underlying structures, ideas or algorithms of any Offering" (SGT § 9(a)).  The jury was instructed that "the parenthetical phrase '(except to the extent specifically permitted by statutory law)' would include the fair use exception of the Copyright Act" (II Instruction No. 14).  The jury found there was a breach of the SGT contract (II Verdict No. 5).

*First*, Splunk argues that reverse engineering is not "specifically" set forth by statutory law on fair use because the statutory right of fair use is a flexible concept.  What statutory law did the parties reasonably have in mind, if not the statutory right of fair use in the Copyright Act?  Splunk alludes to some statute in Germany as what the parties had in mind, to the exclusion of our law.  This is ridiculous.  The contract was made in America and certainly the parties had reasonably in mind American "statutory law" including our Copyright Act.  And, Section 107 specifically allows fair use of copyrighted material.

*Second*, Splunk argues that reverse engineering is not "permitted" by statute, or not "specifically permitted," because fair use protections can be contracted away by private ordering.  It would be a strange contract indeed that contracted away a statutory protection by going out of its way to preserve it.  Again, any ambiguity here must be construed against the drafter.

*Third*, Splunk argues that the exception for statutory permissions applied only to excuse reverse engineering, not to excuse "decompiling, disassembling, or 'otherwise attempt[ing] to discover'" the "underlying structures, ideas, or algorithms" of Splunk Enterprise (Splunk Br. 8).  Splunk's argument is based on the so-called "last antecedent rule," that "qualifying words, phrases[,] and clauses are to be applied to the words or phrases immediately preceding

and are not to be construed as extending to or including others more remote." *ACS Sys., Inc. v. St. Paul Fire & Marine Ins. Co.*, 147 Cal. App. 4th 137, 150 (2007) (cleaned up). This misses the forest for the trees. There is also a canon to construe a contract so that it effects its purpose. Because decompiling and disassembling are common methods of reverse engineering, as established in our trial record, it is difficult to see how a permission to reverse engineer would disallow decompiling or disassembling full stop.

> ### (b)     Reverse Engineering, Testing, and Troubleshooting Not "Internal Business Purpose[s]" Under Section 9(c), or Equal to "Monitor[ing]" Under Section 9(e)?

Splunk next argues Section 9(c) and/or Section 9(e) were necessarily violated by reverse-engineering (Splunk Br. 8–9). We have heard variants of these arguments before (*e.g.*, Dkt. No. 315 at 7–8), but most notably after the phase two verdict came back and Splunk moved for injunctive relief (*see* II Verdict No. 5; Dkt. No. 347). The answer there provided still suffices:

> Note the verdict is ambiguous concerning the extent to which the jury found Cribl liable for breaching the SGT contract. On the one hand, it might have found that several uses of the Splunk Enterprise copyrighted software by Cribl violated the "internal business purposes" use restriction in Section 9(c) and monitoring for competitive purposes use restriction in Section 9(e). On the other hand, it might have found that only the marketing uses did so. In any event, it cannot be said that Cribl has established that it should get off scot-free because some (but not all) of its uses of Splunk Enterprise were fair uses, notwithstanding all language in the SGT contract.
>
> . . .
>
> One question teed up by the briefing of the motion for a permanent injunction is whether the SGT contract's use restrictions governing "internal business purposes" (in Section 9(c)) and monitoring for competitive purposes (in Section 9(e)) could override and disallow those statutory fair uses, as Splunk argued in its motion and at the hearing. As a matter of contract interpretation, this order finds they cannot. Why go through the trouble of spelling out how the SGT contract preserved the extent to which statutory law protects reverse engineering if such restrictions could override and disallow this anyways? Meanwhile, copying and using Splunk Enterprise to reverse engineer the S2S protocol, as required to viably interoperate Cribl Stream with Splunk Enterprise, accomplishes nothing if Cribl cannot copy and use Splunk Enterprise to test and troubleshoot Cribl Stream for maintaining the interoperability. Such ambiguity in the SGT contract will be resolved against the

drafter, Splunk, so as to ultimately allow all statutory fair uses of Splunk Enterprise.  Keep in mind, however, that copying and using Splunk Enterprise to market Cribl Stream was not and is not a statutory fair use.

The verdict is ambiguous concerning the extent to which the jury found Cribl liable for infringing Splunk's copyright.  And, as already mentioned, it is all the more ambiguous concerning the extent to which the jury found Cribl liable for breaching the SGT contract.  On the one hand, it might have found that several uses of Splunk Enterprise by Cribl violated the "internal business purposes" and monitoring for competitive purposes use restrictions.  On the other hand, it might have found that only the marketing uses did so.  Assuming, arguendo, the broadest possible finding of liability (contrary to the interpretation above), this order holds that an injunction is warranted but the balance of the hardships as well as the public interest militate against the broadest possible injunction.

(Order re Remaining Claims 3, 6–7).

\*　　　　\*　　　　\*

Splunk is not entitled to judgment as a matter of law that the SGT License was breached in each of these additional ways so its motion in this respect (Splunk Br. 6–9) is **DENIED**.[\*]

### 2.  THE RULE 59 MOTION.

Splunk alternatively seeks a new trial on breach of the TAP License and on damages. Splunk's arguments for a new trial in each respect are premised wholly on the same arguments already rejected above.  In particular, "[a]s Splunk explained above" but never at trial, to the extent its arguments turn on the provision of the TAP License suggesting that the TAP License overtakes the SGT License in case of conflict, these arguments may or may not be the basis for a claim by Splunk against its counselors — recall the jury found the SGT License breached but the TAP License not breached, the latter being the one Splunk now says should take priority — but these arguments are not the basis for a new trial.  The juries of this district cannot be asked to suffer another trial every time Splunk fails to win and with a new flash of thinking wants another turn.  Splunk's motion for a new trial is **DENIED**.

---

[\*]   For preservation purposes only, Cribl also renews an earlier Rule 50(a) motion (Cribl Br. 11). At trial, Cribl had moved for judgment that the SGT License was not enforceable for instances of Splunk Enterprise downloaded from the Docker website.  Cribl still fails to convince on this point.

United States District Court
Northern District of California

**3.    THE MOTION TO AMEND THE JUDGMENT AND THE INJUNCTION.**

Splunk's motion to amend the judgment and injunction also rest on all the same points already rejected, except that one fresh point is provided.  Splunk argues that the injunction should have specified that the judgment applies to "Cribl Stream" but not "Cribl software." Splunk's argument is that nothing in our trial involved Cribl software other than Cribl Stream. But Splunk made contrary points when requesting to remove Cribl "Stream" from the jury instructions in favor of Cribl software or still broader verbiage  (*e.g.*, Tr. 1752–53 (requesting to remove "Stream" to emphasize "reverse engineering" as such); Dkt. No. 315 at 2, 6 (same, and no contest to "Cribl software")).  That made sense then.  The evidence, the contracts, and the statutory law decided by the jury and the district judge did not turn so narrowly on one version of Cribl's software so much as on Splunk's contracts and the factual requirements for achieving interoperability with Splunk's software (*e.g.*, II Instruction Nos. 8, 14 ("Cribl software")).

The practical import of this amendment is also unclear.  To remain within the scope of the injunction as amended, would Cribl simply ensure that all its software was marketed under the mark Cribl Stream — prompting Splunk to complain next that "Cribl Stream's" scope although *not* expanding superficially *was* expanding substantively?  In its instant motion, Splunk does not point to a substantive expansion, only to the possibility of a superficial one of some kind.  This is not a sufficient basis for amending the injunction.

Splunk's motion to amend the injunction is **DENIED**.

**CONCLUSION**

All post-trial motions are **DENIED.**

**IT IS SO ORDERED.**

Dated: December 31, 2025.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE